## Louisiana *v.* Pilsbury.

1. The act of the General Assembly of the State of Louisiana, of Feb. 23, 1852, entitled " An Act to consolidate the city of New Orleans, and to provide for the government and administration of its affairs," is not in conflict with article 118 of the State Constitution of 1845, which declares that " every law enacted by the legislature shall embrace but one object, and that shall be expressed in the title." Nor does section 37 of the act (*infra*, p. 279) violate article 127 of that Constitution (*infra*, p. 290), touching equality and uniformity of taxation.

2. That article applied only to State taxes, and required that all the property on which they were levied — not all property in the State — should be taxed according to its value, and conformably to some fixed rate or mode.

3. By accepting the bonds which were issued under that section, and the supplementary act passed the same day, known as No. 72, and which formed the consolidated debt of New Orleans, the creditors of the city, of the municipalities, and of Lafayette entered into a contract with the city, an essential part whereof was the pledge to levy an annual tax of a specified amount for the payment of interest and principal. Although slavery has been abolished, the obligation of the city to raise the required fund by special tax on real estate remains, and the right of the bond-holders to enforce it is not waived by having received for years without objection the stipulated interest raised in another mode than that for which the contract provides.

4. The act of the General Assembly of Louisiana of March 6, 1876, so far as it relates to the consolidated debt, is null and void, inasmuch as it provides for exchanging the debt for premium bonds, each of the denomination of twenty dollars, dated Sept. 1, 1875, the principal and interest to be paid at a time to be determined by chance in a lottery, and prohibits the levying of the stipulated tax to pay the interest due upon that debt. It also attempts to deprive the creditor of the means of enforcing payment which existed when the debt was contracted, and it furnishes no other adequate remedy.

ERROR to the Supreme Court of the State of Louisiana.

This was a petition of the State of Louisiana, on the relation

of the Southern Bank, a corporation created under its laws and doing business in New Orleans, to one of its District Courts, for a *mandamus* to compel the municipal authorities of that city to levy a special tax to pay certain coupons on outstanding bonds issued under an act of the State in 18.2, and to purchase the bonds with any surplus remaining of the moneys collected. The history of the issue of the bonds is as follows: The city of New Orleans was originally incorporated by an act of the legislature in 1805, and its charter continued in force until the 8th of March, 1836. An act was then passed which divided the city into three municipalities, each of which was created a distinct corporation, with "such rights, powers, and capacities as are commonly incident" to municipal bodies. This division continued until Feb. 23, 1852, when, by an act known as act No. 71 of that year, and entitled "An Act to consolidate the city of New Orleans and to provide for the government and administration of its affairs," the three municipalities were again united into one. The act of 1836 provided that a proportionate part of the debt of the city should be paid by each municipality, the quota being fixed upon the basis of the amount of taxes and other revenue accruing to it. The separate municipalities subsequently created debts; and the act of Feb. 23, 1852, provided for the issue of bonds for the payment of those debts, and also for the debt of the old city. The thirty-seventh section, which dealt with this subject, is as follows: —

"SECT. 37. *Be it enacted, &c.*, that the debt of the general sinking fund, commonly called the old city debt, and the debts of the three municipalities, whether in the form of bonds, notes, interest coupons, cash warrants, or other species of obligation whatever, shall be assumed and paid by the city of New Orleans, and said city is hereby declared liable therefor. The mayor, comptroller, and treasurer, and chairmen of the finance committees of the two boards of the common council, shall constitute a commission, to be called the commissioners of the consolidated debt of New Orleans; and they shall have power to issue bonds of the city of New Orleans, having not more than forty years to run, with interest payable at such place as may be agreed on between said commissioners and the parties to whom the bonds are issued, in semi-annual coupons,

_in exchange for any bonds_, obligations, or debts of the old corporation, or of any of the old municipalities, whether matured or not, or to sell the new bonds and apply the proceeds to the payment of the matured debts of the old corporation or of the municipalities, but to no other purpose. The bonds thus issued shall form a stock to be called the consolidated debt of New Orleans. At the time this act goes into operation, an exact and detailed statement of the indebtedness of the old corporation and of each municipality shall be filed in the office of the comptroller, by the secretary of the board of liquidators and the municipal comptrollers respectively, when the commissioners of the consolidated debt shall proceed to divide the debt of the old corporation between the several municipalities, in proportion to the assessed value of real estate within the limits of each, according to the State assessment roll for 1851. The amount thus apportioned to each, together with its individual indebtedness at the time this act goes into operation, shall constitute the separate debt of each municipality, and shall be known as the debt of municipality No. one, No. two, No. three. The common council shall, annually, in the month of January, pass an ordinance to raise the sum of six hundred thousand dollars, by a special tax, on real estate and slaves, to be called the consolidated loan tax, and the rate per cent of said tax, in each municipality, shall be in proportion to the indebtedness of each. All ordinances, resolutions, or other acts passed by said council, after the first day of January in each year, shall be null and void, unless the ordinance imposing the consolidation loan tax shall have been previously passed. At the end of each and every year, any surplus of the consolidated loan tax remaining in the treasury, after the payment of all the interest and the expenses of the management of said debt, shall be applied to the purchase, from the lowest bidder, of such bonds issued under this act, as have the shortest period to run; and the common council shall have the right of rejecting all bids demanding more than the face of the bonds; for which purpose, public notice shall be given by the comptroller in the official gazette for thirty days, inviting proposals from bondholders for the sale, to the city, of the bonds herein described. From and after the passage of this act no obligation or evidence of debt of any description whatever, except those herein authorized, shall be issued by the city of New Orleans or under its authority; nor shall any loan be contracted, unless the same be authorized by a vote of a majority of the qualified voters of said city, which shall be taken in the manner prescribed by the city council, after ten days proclamation by the mayor, in the news-

paper chosen by the common council; and no ordinance creating a debt or loan shall be valid, unless such ordinance shall prescribe ways and means for the punctual discharge at maturity of the capital borrowed or debt incurred; and such ordinances shall not be repealed until principal and interest of the capital borrowed or the debt incurred are fully paid and discharged."

By a supplementary act approved on the same day, known as No. 72 of the year, the adjacent city of Lafayette was added to the city of New Orleans, and provision was made for the assumption and payment of its debt. The fifth section of the act is as follows: —

" SECT. 5. *Be it further enacted, &c.,* that the debt of the city of Lafayette shall be assumed and paid by the city of New Orleans, and the said city of New Orleans is hereby declared liable therefor; and the amount of said debt shall be ascertained, and its payment provided for and made in the same manner as the debt of each municipality of New Orleans is ascertained and provided for in the act to which this act is a supplement; and in raising annually the consolidation loan tax for the payment of the debt of New Orleans, an additional sum of fifty thousand dollars shall be raised for the purpose of providing for the debt of the city of Lafayette, now added to that of New Orleans, so that the whole amount of the annual levy of taxes for the payment of the debt of New Orleans shall be six hundred and fifty thousand dollars."

Under these acts, No. 71 and No. 72, the commissioners of the consolidated debt issued bonds of the city of New Orleans, known as consolidated bonds, to the amount of ten million dollars, in exchange for the bonds, obligations, and debts of the old city, of the three municipalities, and of the city of Lafayette. Of this amount bonds exceeding five million dollars have been paid by funds received under the tax levied pursuant to the provisions of the thirty-seventh section of act No. 71 and of the fifth section of act No. 72, beyond what was necessary to meet the annual interest. There remain outstanding bonds for more than four million dollars, with interest since 1876. Of these bonds, with unpaid coupons, the relator owns upward of six hundred, each for the sum of one thousand dollars.

The petition refers to the acts No. 71 and No. 72 of 1852, and cites at length the sections mentioned. It also alleges that the bonds issued under them were negotiable securities; that by reason of the law providing for the payment of the interest and the gradual reduction of their number through a sinking fund, they were negotiated at their par value or above it, and distributed in the markets of Europe and of the United States in the due course of business as a secure, permanent, and trustworthy investment; that the free banks of the State were compelled to invest in them to secure the circulation of their bills, and that individuals and corporations did likewise with confidence in the provisions of sect. 37 of act No. 71, and sect. 5 of act No. 72, for the maintenance and enforcement of which the public faith of the State of Louisiana and of the city of New Orleans was inviolably pledged.

The petition then alleges that, in violation of the provisions of law mentioned, which constitute a contract with the bondholders, binding both upon the State of Louisiana and the city of New Orleans, the legislature of the State, on the 12th of March, 1874, passed an act entitled " An Act to postpone the levy and collection by the city of New Orleans of a tax for a sinking fund for the purchase of its bonds, to authorize the administrators of the city to modify the last budget and tax levy, and to repeal conflicting laws and penalties," the object of which was to relieve the authorities of the city until December, 1876, from the duty of estimating, levying, and collecting any tax for a sinking fund for the purpose of purchasing any of the bonds issued under the acts mentioned.

The petition also alleges that, in further violation of the provisions of the act of 1852, and of the contract with the holders of the bonds, the legislature, on the 6th of March, 1876, passed another act, designed, as stated in its title, to adjust, regulate, and provide for the bonded debt of the city of New Orleans, and authorize the exchange of its bonds for other bonds to be issued on the plan known as the premium bond plan, the avowed object of which was to impair, if possible, the obligation of the contract between the bondholders and the city, and divest the rights acquired by them under it, by prohibiting the city authorities from levying a tax in any year under the pro-

visions of the acts of 1852, by shackling the judicial tribunals in the issue of process, and by repealing the provisions of that act. The seventh section is as follows:—

"SECT. 7. *Be it further enacted, &c.,* that no tax for the payment of bonds or interest on bonds other than that authorized by the preceding sections [the premium bonds], shall be levied either for the year 1876, or any year or years thereafter, by the city of New Orleans, and that all existing laws requiring or authorizing the city council to levy any tax whatsoever for bonds or interest on bonds, other than said premium bonds, be and the same are hereby repealed; and it shall be hereafter incompetent for any court to *mandamus* the officers of said city to levy and collect any interest tax other than that provided in this act, or in case of such *mandamus,* by a receiver or otherwise, to direct the levy and collection of any such tax."

The petition then avers that these acts of the legislature of Louisiana are in conflict with the Constitution of the United States, in that they impair the obligation of the contract between the bondholders and the city; that nevertheless the authorities of the city, its mayor and administrators, in disregard of the provisions of the acts of 1852, and in contempt of their duties and of the rights of the relator and other bondholders similarly situated, have refused to perform the duty imposed upon them by those acts for the years 1874, 1875, 1876, and 1877, to levy a special tax for the payment of the matured coupons and the purchase of bonds; that they have levied upon the property subject to the levy of such special tax for the payment of the consolidated bonds, other taxes to meet other bonds issued by the city in disregard of the prohibitory clauses of sect. 37 of the act of 1852, and the moneys collected have been applied to the payment of those bonds, and other illegal purposes; that the authorities of the city have been notified to levy the special tax required for the years mentioned, but they have refused to discharge their duty in that particular, and, in place thereof, have sought by all sorts of frivolous and unfounded technicalities to contest the validity and integrity of the consolidated bonds; that the relator has demanded payment of the matured coupons held by it, which

was refused, the city authorities answering that there were no funds out of which they could be paid; and that the city and the taxable real estate within its limits are liable for the payment of the matured coupons and for the purchase of said bonds to the extent of $650,000 per annum, for the years 1874, 1875, 1876, and 1877, less coupons paid for 1874 and 1875.

The petitioner, therefore, prays for a *mandamus* and an injunction; the former, commanding the city authorities to levy the special tax of $650,000 for the years named; and the latter, enjoining them from levying any other tax on real estate within the limits of the city which is subject to the special tax for the consolidated debt, until the special tax has been levied.

Upon the petition, an alternative writ of *mandamus* was issued, requiring the city authorities to show cause why they should not comply with its prayer.

The authorities appeared on the return-day and excepted to the jurisdiction of the court to grant the writ, on the following grounds:—

1st, That by the provisions of the acts of the legislature— No. 5 of the extra session of 1870, and No. 31 of 1876—the courts of the State were prohibited from issuing a writ of *mandamus* to compel the respondents to pay any debt not liquidated by judgment, or to levy and collect any interest tax other than that provided in act No. 31 of 1876 (the premium bond act).

2d, That the duty of the respondents, by the city charter and the sixth section of the act No. 31 of 1876, was limited to the levy and collection of a tax on the assessed value of all property subject to taxation within the city, at a rate not exceeding one and one-half per cent on the dollar, to meet all expenses of the city government, and to pay the interest on its bonded debt.

3d, That the respondents are expressly forbidden, by said act No. 31 of 1876, from levying the tax demanded for the year 1876, or for any year afterwards.

4th, That the legislature, by act No. 53 of 1874, had suspended the levy and collection of any tax for the sinking fund under the act of 1872 until December, 1876, which, the re-

spondents charge, was passed with the assent of the Southern Bank.

And if the exceptions should be overruled, the respondents, reiterating and pleading the matters contained in them as part of their answer, further add : —

5th, That the provisions of the thirty-seventh section of act No. 71 of 1852 are unconstitutional and void, because their object is not expressed in the title of the act, as required by art. 118 of the Constitution of 1845, in force at the time.

6th, That the tax provided by the section mentioned is unconstitutional and void, and in violation of sect. 127 of the Constitution of 1845, and art. 123 of the Constitution of 1852; because, first, it is to be assessed on real estate and slaves, and not on personal property; and, secondly, because the rate per cent of the tax in each municipality is to be in proportion to the indebtedness of each.

By a supplementary answer the respondents reiterated the same objections to the writ in more ample terms.

Various parties, including the State of Louisiana, holders of premium bonds, owners of real estate in the city, and taxpayers, were allowed to intervene under the practice which obtains in Louisiana, and various exhibits produced by them were made part of the case.

In March, 1878, the District Court gave judgment granting a peremptory writ of *mandamus* as prayed, and denying the injunction. On appeal to the Supreme Court of the State this judgment was reversed, and judgment entered that the demand of the relator be dismissed, with costs, in both courts. To review this judgment the case is brought to this court.

*Mr. John A. Campbell* and *Mr. Edward Bermudez*, with whom was *Mr. Daniel H. Chamberlain* and *Mr. William B. Hornblower*, for the plaintiff in error.

*Mr. Benjamin F. Jonas* and *Mr. Henry C. Miller* for the defendant in error.

MR. JUSTICE FIELD, after stating the case, delivered the opinion of the court.

As will be seen by the statement of the case, the petition for the *mandamus* proceeds upon the theory that the transac-

tion, authorized by the thirty-seventh section of the act of 1852, and the fifth section of the supplementary act of the same day, when consummated by the issue of the bonds of the city of New Orleans, and their exchange for the obligations of the old city, of the three municipalities, and of the city of Lafayette, constituted a contract between the city and the bondholders, the obligations of which could not be subsequently impaired by State legislation; and that the provision pledging the levy and collection of an annual tax of $600,000, increased by the supplementary act to $650,000, for the payment of the interest on the bonds, and their gradual retirement, was an essential part of that contract.

On the other hand, the city authorities, the respondents here, deny the validity of the act of 1852, on two grounds: 1st, that its object is not sufficiently expressed in its title, under the Constitution of 1845; and, 2d, that in providing for a tax to be levied upon real estate and slaves, to the exclusion of personal property, and in proportion to the indebtedness of each municipality, it violates the Constitution of 1845, which requires equality and uniformity of taxation throughout the State. And they also invoke against the issue of the writ the subsequent legislation of the State limiting the taxes which shall be levied upon property in the city, prescribing the purposes to which they shall be applied, prohibiting the levy and collection of any other tax, and depriving the courts of the State of the power to issue a *mandamus* to compel them to pay any debt not liquidated by judgment, or to levy and collect any interest tax other than that provided by the premium bond act of 1876.

Assuming for the present that the act of 1852 is not invalid, for the reasons stated, the first inquiry is as to the character of the transaction authorized by it and the supplementary act. Did it, when consummated, amount to a contract between the city and parties subsequently taking the bonds; and did the pledge to levy the annual tax named form a part of the contract? Unless both of these questions can be answered in the affirmative, it will be to no purpose to inquire into the subsequent legislation of the State respecting the tax, as no inhibition would rest upon its power over the subject.

The acts of 1852 consolidated the three previously existing municipalities within the limits of New Orleans into one, and added to it the adjacent city of Lafayette. The new corporation took all the property and interests of the municipalities, and of Lafayette, and consequently became subject to their obligations. The advantages which accrued from the possession of their property were accompanied with the burdens of their debts. This liability was not, however, left to rest upon any general principles of corporate liability in such cases. The legislature recognized its existence, and in consolidating the municipalities and the corporation of Lafayette, declared that the debts of the old corporation, of the municipalities, and of that city, should be assumed and paid by the city of New Orleans, which was declared to be liable therefor. The first of the acts appointed commissioners of the debt thus consolidated, and authorized them to issue new bonds of the city having forty years to run, with interest coupons payable semi-annually, in exchange for the obligations and debts of the old corporation, and of the municipalities, to which the debts of Lafayette were subsequently added by the supplementary act. To meet the interest it provided that the common council of the city should annually, in the month of January, pass an ordinance to raise the sum of $600,000, increased to $650,000 by the supplementary act, by a special tax on real estate and slaves, to be called the consolidated loan tax. It also provided that any surplus remaining at the end of each year, after payment of the interest on these bonds, and the expenses of managing the debt, should be applied to the purchase of such of the bonds as might have the shortest period to run. These provisions, until the bonds were accepted, were in the nature of proposals to the creditors of the old city, of the municipalities, and of Lafayette. The State in effect said to them: The city will give these bonds, running for the period designated, and drawing interest, in exchange for your demands; and as security for the payment of interest, and the gradual redemption of the principal, the city shall annually, in January, levy a special tax for that purpose to the amount of $650,000. The provisions were designed to give value to the proposed bonds in the markets of the country, and necessarily operated

as an inducement to the creditors to take them. When the bonds were issued and taken by the creditors, a contract was consummated between them and the city as fully as if all the provisions had been embodied as express stipulations in the most formal instrument signed by the parties. On the one hand, the creditors surrendered their debts against the former municipalities; and, on the other hand, in consideration of the surrender, the city gave to them its bonds, which carried the pledge of an annual tax of a specified amount for the payment of the interest on them, and ultimately of the principal. The annual tax was the security offered to the creditors; and it could not be afterwards severed from the contract without violating its stipulations, any more than a mortgage executed as security for a note given for a loan could be subsequently repudiated as forming no part of the transaction. Nearly all legislative contracts are made in a similar way. The law authorizes certain bonds to be issued, or certain work to be done upon specified conditions. When these are accepted, a contract is entered into imposing the duties and creating the liabilities of the most carefully drawn instrument embodying the provisions. *Von Hoffman* v. *City of Quincy*, 4 Wall. 535; *Hartman* v. *Greenhow*, 102 U. S. 672; *People* v. *Bond*, 10 Cal. 563; *Brooklyn Park Company* v. *Armstrong*, 45 N. Y. 235.

There were other provisions in the act of 1852 besides those stated, which, though not essential to the obligatory form of the contract, were designed to inspire the creditors with confidence in the punctual payment of the interest and principal. It declared that all ordinances, resolutions, or other acts passed by the council after the first day of January of each year should be null and void, unless the ordinance imposing the consolidated loan tax should have been previously passed. It also declared that after its passage no obligation or evidence of debt of any description whatever, except those therein authorized, should be issued by the city or under its authority. Whatever legal force may be ascribed to them, they were intended as solemn asseverations that the pledge of the annual tax should never be violated.

The question then arises, Was the act of 1852 valid? Its

invalidity is asserted, as stated above, on two grounds; the first of which is that its object is not expressed in its title, as required by article 118 of the Constitution of 1845. The title of the act is "An Act to consolidate the city of New Orleans, and to provide for the government and administration of its affairs." The article of the Constitution declares that "every law enacted by the legislature shall embrace but one object, and that shall be expressed in the title." A similar provision is found in several State Constitutions. Its object is to prevent the practice, common in all legislative bodies where no such provision exists, of embracing in the same bill incongruous matters, having no relation to each other, or to the subject specified in the title; by which measures are often adopted without attracting attention, which, if noticed, would have been resisted and defeated. It thus serves to prevent surprise in legislation. But it was not intended to forbid the union of several different provisions in the same bill, if they are germane to the general subject indicated by its title. A bill to incorporate a city and provide for its government may, without conflicting with the constitutional clause, contain provisions relating to the various subjects upon which municipal legislation may be required for the preservation of peace, good order, and health within its limits, the promotion of its growth and prosperity, and the raising of revenue for its government. So here, under the title of the act in question, provisions might be enacted, not merely relating to the union of the different municipalities and the government of the city, but to all the varied details into which the general administration of its affairs might lead. The municipalities were in debt at the consolidation, and this was well known to the legislature. A change in their government, and in the administration of their affairs, required some disposition to be made of their debts. Whatever interests were possessed by them were the proper subjects of legislation in the act which took them out of existence as separate municipalities and created a new corporation in their place, with power to deal with their affairs. We hold, therefore, that the act of 1852 was not invalid, on the ground that its object is not sufficiently expressed in its title.

The second ground of objection to the validity of the act of 1852 is, that the tax prescribed is to be levied upon real estate and slaves to the exclusion of personal property, and in each municipality in proportion to its indebtedness ; which, as contended, violated the rule of equality and uniformity required by the Constitution of 1845. The language of the act is, that " The common council shall annually, in the month of January, pass an ordinance to raise the sum of $600,000, by a special tax on real estate and slaves, to be called the consolidated loan tax, and the rate per cent of said tax in each municipality shall be in proportion to the indebtedness of each." This amount, as already stated, was, upon the annexation of the city of Lafayette, increased to $650,000. On the passage of this act, — Feb. 23, 1852, — the Constitution of 1845 was in force. The Constitution of 1852 was not adopted until July of that year. Article 127 of the Constitution of 1845 is as follows : " Taxation shall be equal and uniform throughout the State. After the year 1848, all property on which taxes may be levied in this State shall be taxed in proportion to its value, to be ascertained as directed by law. No one species of property shall be taxed higher than another species of property of equal value on which taxes shall be levied ; the legislature shall have power to levy an income tax, and to tax all persons pursuing any occupation, trade, or profession."

This article has been frequently before the Supreme Court of the State for construction, and until the decision of the present case the requirement of equality and uniformity in the tax has been held to apply only to taxes levied for State, and not to those levied for municipal purposes. The first case was *Second Municipality of New Orleans* v. *Duncan*, 2 La. Ann. 182. That municipality had passed an ordinance imposing a special tax of one per cent on all real estate within its limits, for the purpose of paying its debts and providing for the support of schools ; and objection was taken to its constitutionality on two grounds : 1st, that the power of taxation was vested exclusively in the legislature, and could not be delegated to the municipality ; and, 2d, that the taxation authorized impinged upon the rule that no one species of property should be unduly assessed. Both grounds were supposed to derive support from

the article of the Constitution in question, — the first, because, as contended, the equality and uniformity required throughout the State were only obtainable by confining the exercise of the power of taxation to the legislature, whose authority was coextensive with the territorial limits of the State; and the second, from the inhibition against taxing one species of property higher than another. But the court replied, speaking through its Chief Justice: "The article by its terms applies to State, and not to municipal, taxes. It provides for equality and uniformity of taxation *throughout the State*. . . . The framers of the Constitution had before them the condition of the municipalities of New Orleans, with their debts, their abuses, and their wants; and their corporate existence is recognized and continued, as to certain public rights, by an express provision. The jurisprudence under which the present system of taxation had grown up was before them, and the power of remedying the evils of misgovernment was left *in statu quo*, with the legislature; and the convention confined itself to providing for the State government, leaving the municipal bodies, as it is believed sound policy justified, under legislative control." And referring to the admission made in the record that there was no special ordinance of the municipality assessing taxes on personal property, the court added: " We know of no reason imperative on the municipality to impose their taxes in any particular form, or to include any other species of property in an ordinance imposing a tax on real estate. It constitutes no objection, under any view of the subject, to the validity of this tax, that personal property was not also taxed by special ordinance."

This case was decided in 1847, and it is objected that it arose before that part of the article went into effect, which declares that " no one species of property shall be taxed higher than another species of property of equal value on which taxes shall be levied." It is doubtful whether this objection be correct in point of fact, but assuming it to be so, the requirement of equality and uniformity was in force; and the part cited does not require that taxation shall be universal. It simply requires that when different kinds of property are taxed, the rate of taxation shall be the same on all. The construction

given was afterwards affirmed by the same court in *City of Lafayette* v. *Cummins* (3 La. Ann. 673), decided in 1848. There the question was as to the validity of a municipal tax on the trade and occupation of the defendant as a butcher, levied under an ordinance of the city passed in 1847. There were other trades and occupations not embraced in the ordinance, and, consequently, not taxed. It was, therefore, contended that the imposition of the tax was contrary to that clause of the article of the Constitution which provides for the equality and uniformity of taxation throughout the State. But the court replied that " in the case of *Duncan* v. *Second Municipality*, this question, after very thorough argument, was determined by this court, and the article was held applicable only to State, and not to municipal, taxes." It is said in answer to this decision that the language of the court was a mere dictum. We do not so regard it. The point of contention in the case was whether the equality and uniformity applied to taxation on occupations and trades as well as on property. The answer which met the objection to the taxation on real property exclusively was held to meet the objection to taxation on certain occupations to the exclusion of others.

The Constitution of 1852 contained a similar clause, — identical in language, omitting the words " after the year 1848," — and with one exception, subsequently reversed, it has received a similar construction from the Supreme Court of the State. The case referred to was that of *Municipality No. 2* v. *White and Others*, which arose in 1854. 9 La. Ann. 446. The municipality had imposed a tax on the owners of property contiguous to a newly opened street, to pay the expenses of opening it, under a law which authorized the apportionment of the cost in such cases upon the owners of adjacent property, according to the benefit derived from the improvement. The court was of opinion that the law was liable to the objection that the tax was not equal and uniform, as required by the clause in question, and held it to be unconstitutional. The decision was in conflict with that in Duncan's case, but it was rendered by a divided court; and in *Yeatman* v. *Crandall*, which arose in 1856, it was overruled. In the latter case, the plaintiff sought to enjoin the collection of a levee tax, which was imposed on

certain alluvial lands, on the ground that the statute authorizing it was unconstitutional, in that it violated the rule of equality and uniformity prescribed by the article in question. But the court said: " This article refers to State taxation, in its proper sense, for general or State purposes.  When it says that taxation shall be equal and uniform throughout the State, it points directly to its object, which is to regulate the mode of filling the State treasury.  It does not take away the power of making local assessments for local improvements, upon the equitable principle that he who reaps the benefit must bear the burden. . . . It is notorious that an acre of land pays twice as great a tax for local purposes in one parish as an acre of equal value pays in another parish.  Yet no one thinks the Constitution infringed by such a state of things."   11 La. Ann. 220.

By this decision the doctrine of the earlier cases, upon the clause in the Constitution of 1845, was re-established ; and one of the judges, who had concurred in the decision in the White case, stated that he had been led to reconsider his opinion, and that he yielded his former impressions on this point the more readily, because the Supreme Court which sat under the Constitution of 1845, and five of the seven judges with whom he had sat upon the bench, had concurred in holding that the article in question was not intended to apply to municipal or local taxation for local improvements.

The doctrine of this case was affirmed the same year in *Surgi* v. *Snetchman* (11 La. Ann. 387), and again in 1859 in *Wallace* v. *Shelton*, 14 id. 498.   In its opinion, in the latter case, the court said that the questions in the Yeatman case were decided upon full consideration, after having the aid of the arguments of learned counsel in that case, and also in another case then under consideration on a rehearing, and were subsequently affirmed in the two cases mentioned ; and added that, " after these decisions, which were in conformity with those under the Constitution of 1845, we had hoped the question would be considered as at rest."

The objection to the want of equality and uniformity in the taxation authorized by the act of 1852, in that it was to be levied on the property of the different municipalities in pro-

portion to the indebtedness of each, does not strike us as possessing much force. The debts created by the municipalities were separate and different in amounts, and before the consolidation the taxes upon the property in them must necessarily have been assessed at different rates. There was no obligation upon the legislature to relieve either of them from the unequal burdens consequent upon the different amounts of their indebtedness. The subject was one resting in its discretion. Nor was it an unreasonable provision, when authorizing the city to issue its bonds for the indebtedness of them all, to require that taxation to raise the funds for their payment should be thus apportioned.

From the extended reference to the adjudications of the Supreme Court of Louisiana, upon the Constitution of 1845, requiring uniformity and equality in taxation, there can be no serious question as to the validity of the act of 1852, so far as the consolidated bonds of the city of New Orleans are concerned, and the provisions made by it and the supplementary act for the annual levy of a tax of $650,000 to pay the interest and reduce the principal. The decisions upon the clause of the Constitution of 1852 are corroborative of the correctness of the construction originally placed upon the clause of the Constitution of 1845. Whether such a construction was a sound one is not an open question in considering the validity of the bonds. The exposition given by the highest tribunal of the State must be taken as correct so far as contracts made under the act are concerned. Their validity and obligation cannot be impaired by any subsequent decision altering the construction. This doctrine applies as well to the construction of a provision of the organic law, as to the construction of a statute. The construction, so far as contract obligations incurred under it are concerned, constitutes a part of the law as much as if embodied in it. So far does this doctrine extend, that when a statute of two States, expressed in the same terms, is construed differently by the highest courts, they are treated by us as different laws, each embodying the particular construction of its own State, and enforced in accordance with it in all cases arising under it. *Christy* v. *Pridgeon,* 4 Wall. 196, and *Shelby* v. *Guy,* 11 Wheat. 361. The statute as thus

expounded determines the validity of all contracts under it. A subsequent change in its interpretation can affect only subsequent contracts. The doctrine on this subject is aptly and forcibly stated by the Chief Justice in the recent case of *Douglass* v. *County of Pike*, 101 U. S. 677, 687. "The true rule," he observes, "is to give a change of judicial construction in respect to a statute the same effect in its operation on contracts and existing contract rights that would be given to a legislative amendment; that is to say, make it prospective, not retroactive. After a statute has been settled by judicial construction, the construction becomes, so far as contract rights acquired under it are concerned, as much a part of the statute as the text itself, and a change of decision is, to all intents and purposes, the same in its effect on contracts as an amendment of the law by means of a legislative enactment." See also *Gelpcke* v. *City of Dubuque*, 1 Wall. 175; *Havemeyer* v. *Iowa County*, 3 id. 294; *Thomson* v. *Lee County*, id. 327; *Lee County* v. *Rogers*, 7 id. 181; *Chicago* v. *Sheldon*, 9 id. 50; *Olcott* v. *The Supervisors*, 16 id. 678; *Fairfield* v. *County of Gallatin*, 100 U. S. 47.

We refer to this doctrine, not from any doubt as to the correctness of the construction of the article of the Constitution of 1845 given by the Supreme Court of the State, but in answer to the objections of counsel and the position of the court below. We are of opinion that the construction given was correct. It is impossible to apply to the varying wants of a municipality the rule invoked with reference to taxation for State purposes on property throughout the State, without producing the very inequality which that rule was designed to prevent. There would often be manifest injustice in subjecting the whole property of a city to taxation for an improvement of a local character. The rule that he who reaps the benefit should bear the burden must in such cases be applied. The same construction of a similar clause in the constitutions of other States has been adopted by their highest courts. The Constitution of Virginia of 1850 prescribed that " taxation shall be equal and uniform throughout the Commonwealth, and all property, other than slaves, shall be taxed in proportion to its value, which shall be ascertained in such manner as may be prescribed by law "

and the Court of Appeals of the State held that the provision related solely to taxation for purposes of State revenue, and did not apply to taxes by counties and corporations for local purposes. *Gilkeson v. The Frederick Justices*, 13 Gratt. (Va.) 577. The Constitution of Arkansas of 1836 provided that "all property subject to taxation shall be taxed according to its value, — that value to be ascertained in such manner as the General Assembly shall direct, — making the same equal and uniform throughout the State;" and the Supreme Court of the State held that the provision was intended to apply to State revenue, and was not applicable to taxes levied for county purposes. *Washington v. The State*, 13 Ark. 752. See also *McGehee v. Mathis*, 21 id. 40.

That taxation for State purposes, to be equal and uniform within the meaning of the Constitution of 1845, need not have been universal, is a proposition which calls for no argument. It was only necessary that all property on which taxes were levied — not all property in the State — should be taxed according to its value, and in conformity with some fixed rate or mode. *State v. Lathrop*, 10 La. Ann. 398; *New Orleans v. Commercial Bank*, id. 735.

The validity of the consolidated debt of New Orleans, and the obligation of the city to provide for the payment of the interest and the redemption of the principal, were never questioned by the legislative department of the State until 1876, but were repeatedly and in the most emphatic manner recognized and affirmed. In fourteen acts of the legislature passed prior to that year the consolidated bonds are referred to as valid obligations of the city, though in one of them, it is true, a different mode of raising the tax from that specified in the act of 1852 is required, and in another the levy and collection of the tax are postponed for two years. Thus the act passed in 1856 amending the charter provides that the common council shall in each year levy an equal and uniform tax upon all property in the city, real and personal, but that said tax, added to the consolidated loan tax and other taxes designated, shall not in the aggregate be more than one dollar and a half on one hundred dollars of valuation, except in case of invasion, "provided it be sufficient to pay the interest on the consolidated debt and

railroad bonds issued by the city of New Orleans." In the mode thus prescribed the amount stipulated by the act of 1852 was annually raised and applied until 1874, without objection from the bondholders. Hence it is contended that they waived their right to the special tax mentioned. But no such inference can be justly drawn from their silence. They could not complain so long as the amount prescribed was raised and applied as stipulated. Had the requisite funds been given to the city, and then applied to pay the interest on the bonds, and to purchase with the residue such of them as had the shortest time to run, the bondholders would have been equally without cause of complaint, and would as little have waived by their silence the right to insist upon the special tax if a resort to it should become necessary. Nor is their right in that respect affected by the fact that since 1852 slavery has been abolished, and that there are no longer slaves upon whom taxation can be levied. The obligation of the city to raise the required fund by special tax on real estate still remains. That is no more lessened than it would be by the destruction of any other portion of the taxable property; although the rate of taxation on what is left might be thereby increased.

The act of 1874, which postponed the levy and collection of the tax for a sinking fund for the purchase of bonds of the city until December, 1876, also declared that the act should in no wise be construed to hinder, delay, or affect the prompt payment of the interest on them as they matured. The validity of the consolidation bonds was "recognized in all its integrity, it being the object of the act to afford temporary relief to the taxpayers of New Orleans in the embarrassed condition of its affairs, and not to detract from or impair the rights of the holders of said bonds."

But notwithstanding this declaration of the validity of the consolidated debt, and the inviolability of the provisions for its payment, no tax was subsequently raised to pay the interest, or to retire the principal. And before the time arrived to which the postponement of a levy was made, new light respecting the obligations of the city and the rights of the bondholders had dawned upon the city authorities. Although for twenty-two years all departments of the State government had recog-

nized the validity of the bonds, and the annual interest had been regularly paid, and more than half of them retired, it was then for the first time discovered that the act of 1852, authorizing the issue of the bonds, was invalid, that its object was not sufficiently stated in the title, that the tax prescribed was neither equal nor uniform, and therefore was in conflict with the Constitution. The outcome of these new notions was the Premium Bond Act of March 6, 1876, passed by the legislature at the solicitation of the municipal authorities.

This act is a most remarkable piece of legislation. So far as the consolidated bonds are concerned, it amounts to little less than open repudiation of the city's faith. It admits that the debt of the city as established by law is so large as to require for its liquidation taxation on property within its limits at the rate of at least five per cent; and yet authorizes a tax of only one and a half per cent to pay the expenses of the city government, and to meet the obligations which are offered in exchange for those bonds.

It recites in its preamble that the total debt of the city, bonded and floating, exceeds $23,000,000; that the taxable property of the city has become so reduced in value as to require a tax at the rate of at least five per cent per annum to liquidate the debt; that the levying of a tax at so exorbitant a rate will render its collection impossible; that the continuation of a tax beyond the ability of the property to pay would lead to a further destruction of the assessable property of the city and to ultimate practical bankruptcy; and that the council of the city have adopted a plan for the liquidation of its indebtedness, looking to the payment of its creditors in full, " obtaining thereby the indulgence necessary for the public well-being and the maintenance of the public honor."

The plan proposed was to exchange all recognized and valid bonds of the city of New Orleans, and of the cities of Jefferson and Carrollton, for bonds to be known as premium bonds of the city; the latter to be of the denomination of twenty dollars, and dated Sept. 1, 1875, each bearing five per cent interest from July 15 of that year, the interest and principal to be paid at the same time and not separately, and that time to be determined by chance in a lottery. One million of these

bonds was to be divided into ten thousand series of one hundred bonds each. The ten thousand series were to be placed in a wheel, and, in April and October of each year, as many series were to be drawn as were to be redeemed, according to a certain schedule adopted. The bonds composing the series thus drawn were to be entered for payment three months thereafter, principal and interest, and were to be receivable for all taxes, licenses, and other obligations of the city. At the expiration of the three months the bond numbers of the drawn series were to be placed in a wheel and 1,176 prizes, amounting to $50,000, were to be drawn and distributed. Under this plan the city was to be released from payment of the principal and interest of its debt, except such portion as might be drawn in the lottery each year. Under this arrangement it would depend upon the turn of a wheel and the drawing of a fortunate number whether a creditor would be paid in one year or in fifty years. The plan completely disregards all the conditions upon which the consolidated bonds were issued, and postpones indefinitely the payment of interest and principal, or rather leaves the time of payment within fifty years to be determined by chance.

The act of 1852, as we have stated, declares that the city council shall, in January of every year, pass an ordinance for the levy and collection of a special tax to be applied to the payment of the interest on the consolidated bonds and to retire the principal. The act of 1876 declares that no tax shall be levied by the city council that year or any year afterwards to pay the principal or interest on those bonds, or on any other than the premium bonds. The act of 1852 declares that all ordinances, resolutions, and acts of the city council of any year shall be null and void, unless the ordinance imposing the special tax designated shall have been previously passed. The act of 1876 declares that all laws requiring or authorizing the city council to levy any tax for bonds or interest on bonds other than premium bonds are repealed; and, as if that was not sufficient evidence of the repudiation of former obligations, it forbids the courts to issue a *mandamus* to the officers of the city to levy and collect any interest tax other than for those bonds.

To meet the interest on them and for all other purposes of the city, the act further provides that a tax of only one and one-half per cent per annum shall be levied; and this limitation of the taxing power of the corporation is " declared to be a contract not only with the holder of said premium bonds, but also with all residents and tax-payers of said city, so as to authorize any holder of said premium bonds to legally object to any rate of taxation in excess of the rate herein limited."

If the provisions of this act nullifying the pledges of the act of 1852 are valid, the consolidated bonds are virtually destroyed; no taxation is allowed to raise funds for them; their payment, therefore, would be so uncertain as to render them practically valueless. The chance with premium bonds offered in their place of a favorable turn of the wheel in a lottery would be a poor substitute for the levy of an annual tax for the payment of interest and principal. We shall not waste words upon the scheme thus developed to evade the just obligations of the city. Notwithstanding the declaration in its preamble, that the act seeks from the creditors the indulgence necessary " for the public well-being and the maintenance of the public honor," it is, so far as the consolidated bonds are concerned, tainted with the leprosy of repudiation. It says to the creditors : " Take these premium bonds, and trust for payment within fifty years to your fortune in the lottery we offer; no other way is left open to obtain a possible payment. No tax can be levied for your benefit. No compulsory writ can issue from the courts. Take these bonds or take nothing." The primal duty of the city authorities to fulfil punctually their obligations and maintain good faith is thus proclaimed to be no duty at all.

We do not deny that the power of taxation belongs exclusively to the legislative department of the government, that the extent to which it may be delegated to municipal bodies is a matter of discretion, and that in general the power may be revoked at the pleasure of the legislature. But, as we said in the case of *Wolff* v. *New Orleans*, decided at the last term, legislation revoking the power is subject to this qualification, which attends all State legislation, that it " shall not conflict with the prohibitions of the Constitution of the United States

and, among other things, shall not operate directly upon contracts of the corporation, so as to impair their obligation by abrogating or lessening the means of their enforcement. Legislation producing this latter result, not indirectly as a consequence of legitimate measures taken, as will sometimes happen, but directly by operating upon those means, is prohibited by the Constitution, and must be disregarded — treated as if never enacted — by all courts recognizing the Constitution as the paramount law of the land.    This doctrine has been repeatedly asserted by this court when attempts have been made to limit the power of taxation of a municipal body, upon the faith of which contracts have been made, and by means of which alone they could be performed. . . . However great the control of the legislature over the corporation while it is in existence, it must be exercised in subordination to the principle which secures the inviolability of contracts."

The case of *Von Hoffman* v. *City of Quincy*, reported in 4th Wallace, is a leading one on this subject.    The court there said, " that when a State has authorized a municipal corporation to contract, and to exercise the power of local taxation to the extent necessary to meet its engagements, the power thus given cannot be withdrawn until the contract is satisfied.   The State, and the corporation, in such cases, are equally bound."

The inhibition upon the courts of the State to issue a *mandamus* for the levy of a tax for the payment of interest or principal of any bonds except those issued under the premium-bond plan was a clear impairment of the means for the enforcement of the contract with the holders of the consolidated bonds. When the contract was made, the writ was the usual and the only effective means to compel the city authorities to do their duty in the premises, in case of their failure to provide in other ways the required funds.    There was no other complete and adequate remedy.    The only ground on which a change of remedy existing when a contract was made is permissible without impairment of the contract is, that a new and adequate and efficacious remedy be substituted for that which is superseded.    Here no remedy whatever is substituted for that of *mandamus*.    The holders are denied all remedy.    *Louisiana.* v. *New Orleans,* 102 U. S. 203–207.

Legislation of a State thus impairing the obligation of contracts made under its authority is null and void, and the courts in enforcing the contracts will pursue the same course and apply the same remedies as though such invalid legislation had never existed. The act of March, 1876, cannot, therefore, be permitted to restrict the power of the city authorities to levy the tax stipulated by the act of 1852 to pay the interest on the consolidated bonds issued thereunder, and to retire the bonds.

It follows from the views expressed that the judgment of the Supreme Court of the State of Louisiana must be reversed, and the cause be remanded to that court with instructions to reinstate the same and to remand it to the Third District Court of the Parish of Orleans, or its successor, to carry into effect the provisions of the thirty-seventh section of the act of the legislature approved Feb. 23, 1852, and the fifth section of the supplementary act approved the same day, embraced in Nos. 71 and 72 of the acts of that year, as containing a valid contract between the city of New Orleans and the creditors holding the bonds issued under them; and to direct the District Court to issue a *mandamus* to the city of New Orleans and its authorities, annually to levy and collect the tax of $650,000 directed by the acts, and to apply the same in the following order: First, to the payment of the current interest of the year; secondly, to the payment of arrearages of interest of former years until all the arrearages are satisfied; and, thirdly, to the purchase of bonds having the shortest period to run.

Judgment to this effect, and that the defendants pay the costs in this court and in the Supreme and District Courts of Louisiana, will be entered.