## VIDAL v. FERNANDEZ, Atty. Gen. of Puerto Rico, et al.

### No. 3411.

Circuit Court of Appeals, First Circuit.

June 13, 1939.

Henri Brown, of San Juan, P. R., for appellant.

William Cattron Rigby, of Washington, D. C. (B. Fernandez Garcia, Atty. Gen., of San Juan, P. R., and Nathan R. Margold, Solicitor, Dept. Interior, of Washington, D. C., on the brief), for appellees.

Before WILSON, Circuit Judge, and PETERS and MAHONEY, District Judges.

WILSON, Circuit Judge.

This is an appeal from a decision of the District Court of the United States for Puerto Rico by Felipe F. Vidal, the receiver theretofore appointed by that court for the Benitez Sugar Company, a corporation organized under the laws of Puerto Rico, and for the Communidad Jose J. Benitez e Hijos against the Attorney Gen-

eral of Puerto Rico and the Commissioner of Agriculture and Commerce of Puerto Rico to enjoin the enforcement by said officials of Act No. 112 of the Puerto Rican Legislature approved May 13, 1937.

Petitioner's motion for a preliminary injunction was denied; an amended petition was filed, the respondent answered and a hearing was held. The District Court made findings of fact and conclusions of law, and on August 18, 1938, entered its final decree upholding the validity of the Act, and finally denying the prayer for a permanent injunction and dismissed the bill.

From this decree an appeal was taken to this court.

The petitioner, receiver, assigned, among others, the following errors on which he relies:

"1. Act No. 112, approved May 13, 1937, is invalid because it violates the provisions of Section 34 of the Organic Act of Puerto Rico regarding the subject and title of statutes and the amendment of laws.

"2. Whether the said Act be construed as a statute fixing maximum tolls to be charged by Centrals for grinding and processing sugar cane, or as fixing minimum prices for sugar cane to be paid by Centrals, such tolls or prices make it impossible for the Receiver to continue the business of manufacturing sugar without serious loss and result in an unlawful taking of the property confided to his custody and destruction of the business which he is charged with the duty of continuing.

"3. The statute is an arbitrary and unreasonable infringement of property rights, an unwarranted and oppressive interference with liberty of contract, denies the equal protection of the laws, and is for these reasons in violation of the Organic Act of Puerto Rico.

"4. The statute is invalid because it is without the powers of the legislature of Puerto Rico.

"5. The penalties imposed by the statute are so severe as to deprive Centrals of the equal protection of the laws and to violate the due process clause of the Organic Act of Puerto Rico."

Section 34 of the Organic Act, 48 U.S. C.A. §§ 832, 835, provides that:

"No bill, except general appropriation bills, shall be passed containing more than one subject, which shall be clearly expressed in its title; but if any subject shall be embraced in any act which shall not be expressed in the title, such act shall be void only as to so much thereof as shall not be so expressed. * * *

"No law shall be revived, or amended, or the provisions thereof extended or conferred by reference to its title only, but so much thereof as is revived, amended, extended, or conferred shall be reenacted and published at length."

The trial court overruled this objection, citing Gallardo v. Porto Rico Ry., Light & Power Co., 1 Cir., 18 F.2d 918, saying on page 922:

"The court below found it unnecessary to decide this point. It is without merit. The title shows clearly that a special tax is to be levied 'for * * * the construction of works for the development of the water power of the island of Porto Rico.' This states a single main object; and is fully sufficient to guard against the evil confusion prohibited by the Organic Act. Carter County v. Sinton, 120 U.S. 517, 7 S.Ct. 650, 30 L.Ed. 701; Jonesboro City v. Cairo & St. Louis R. Co., 110 U.S. 192, 4 S.Ct. 67, 28 L.Ed. 116; Louisiana ex rel. Southern Bank v. Pilsbury, 105 U.S. 278, 26 L.Ed. 1090; Benedicto, Treas., v. Porto Rican American Tobacco Co. (C.C.A.) 256 F. 422."

The Supreme Court in Carter County v. Sinton, 120 U.S. 517, page 522, 7 S.Ct. 650, page 653, 30 L.Ed. 701, stated the purpose of such provisions as follows:

"The provision of the constitution of Kentucky relied on is article 2, § 37, as follows:

"'No law enacted by the general assembly shall relate to more than one subject, and that shall be expressed in the title.'

"Undoubtedly the design of this provision was, as is said in Pennington v. Woolfolk, 79 Ky. [13], 20, 'to prevent the use of deceptive titles as a cover for vicious legislation, by enabling members of the general assembly to form such opinion of the nature of a bill by merely hearing it read by its title;' but as early as 1859 the Court of Appeals said in Phillips v. Covington & Cincinnati Bridge Company, 2 Metc. (Ky.) [219], 221: 'This prohibition should receive a reasonable and not a technical construction; and, looking to the evil intended to be remedied, it should be

applied to such acts of the legislature alone as are obviously within its spirit and meaning. None of the provisions of a statute should be regarded as unconstitutional when they all relate directly or indirectly to the same subject, have a natural connection, and are not foreign to the subject expressed in its title.' "

And in Posados v. Warner, Barnes & Company, 279 U.S. 340, 344, 49 S.Ct. 333, 334, 73 L.Ed. 729, the Supreme Court further stated the purpose of such provisions:

"The purpose is to prevent the inclusion of incongruous and unrelated matters in the same measure and to guard against inadvertence, stealth and fraud in legislation. When bills conform to such requirements, their titles serve conveniently to apprise legislators and the public of the subjects under consideration. Courts strictly enforce such provisions in cases that fall within the reasons on which they rest. But, as freedom required or convenient for the effective exertion of the legislative power ought not unnecessarily or lightly to be interfered with, the courts disregard mere verbal inaccuracies, resolve doubts in favor of validity, and hold that, in order to warrant the setting aside of enactments for failure to comply with the rule, the violation must be substantial and plain. Louisiana ex rel. Southern Bank v. Pilsbury, 105 U.S. 278, 289, 26 L.Ed. 1090; Montclair v. Ramsdell, 107 U.S. 147, 153, 2 S.Ct. 391, 27 L.Ed. 431; Read v. Plattsmouth, 107 U.S. 568, 578, 2 S.Ct. 208, 27 L.Ed. 414. City of South St. Paul v. Lamprecht Bros. Co., 8 Cir., 88 F. 449, 451. Johnson v. Harrison, 47 Minn. 575, 50 N.W. 923, 28 Am.St.Rep. 382; Cooley's Constitutional Limitations (7th Ed.) p. 202 et seq."

The District Court was right in overruling this objection and in holding the title of the Act was sufficient to comply with the provisions of Sec. 34 of the Organic Act.

The provision referring to amendment of other laws is not violated. "It must be given a reasonable, although not a narrow or technical, construction." Benedicto, Treas., v. Porto Rican American Tobacco Co., 1 Cir., 256 F. 422, 425.

The District Court further said: "Act No. 112 is a complete law in itself constituting an entire act of legislation on the subject with which it deals, and it may therefore amend or supersede by implication provisions of prior acts. See Southern Pacific Co. v. Bartine et al., C.C., 170 F. 725; Mills v. Smith, 9 Cir., 177 F. 652."

If the legislature were always required in enacting a new statute to search through the entire body of the laws of a state to seek out and to copy into the new legislation, and thus reenact at length every earlier statute that might be affected in any way by the new legislation, the process of legislation would break down. No such thing was contemplated by Congress.

One of the appellant's assignments of error is that Act No. 112 is without the powers of the Legislature of Puerto Rico, but this assignment appears to be answered by the appellee in his brief, in which he states that his petition did not challenge the power of the Legislature to fix prices or otherwise the growing, selling and grinding of sugar cane. For the purposes of his petition the receiver did not dispute the authority of the Legislature over the subject matter.

Apparently the receiver, admitting that Act 112 was a proper exercise of the police power of the Puerto Rican Legislature, now rests his position before this court on the proposition that the method of its exercise in the instant statute is arbitrary and discriminatory, and constituted an unwarranted interference with liberty to contract.

Under the second assignment of error relied on it was said that:

"Whether the said Act be construed as a statute fixing maximum tolls to be charged by Centrals for grinding and processing sugar cane, or as fixing minimum prices for sugar cane to be paid by Centrals, such tolls or prices make it impossible for the Receiver to continue the business of manufacturing sugar without serious loss and result in an unlawful taking of the property confided to his custody and destruction of the business which he is charged with the duty of continuing."

The District Court met this objection in his opinion in which he said:

"It is quite generally known that with the present market price of sugar many centrals operating in the Island of Puerto Rico will show practically no profit this year. I am impressed with the idea that it is the market price of sugar which is primarily responsible for any loss which

Central Playa Grande will sustain on the present year's operation."

The appellant's main contention is summed up in his third assignment, in which he states:

"The statute is an arbitrary and unreasonable infringement of property rights, an unwarranted and oppressive interference with liberty of contract, denies the equal protection of the laws, and is for these reasons in violation of the Organic Act of Puerto Rico."

In considering the points raised by the receiver, it must be borne in mind that Puerto Rico is a densely populated community, with a farming population averaging more than 500 people to the square mile; and is largely a one-crop land, in which the chief crop, sugar, so largely monopolizes the fertile lands and represents so large a proportion of the total wealth of the Island, where practically two thirds of the total shipments of all the products shipped to the mainland in 1937–38, and where practically all the sugar cane is ground in large mills or "centrals" which are beyond the means of the small colono or farmer to operate, that the result is that the small farmer of necessity must send his cane to be ground at the nearest central, owing to the fact that the cane is a perishable product requiring it to be ground promptly and is not capable of being transported long distances, except at heavy freight or cartage charges. The small colonos are, therefore, at a disadvantage in dealing with the large "centrals". The receiver recognized these conditions and does not challenge the power of the Puerto Rican Legislature to regulate these conditions.

The receiver's second assignment of error involves a finding of fact that the enforcement of the Act No. 112 would make it impossible for the receiver to continue business on the Island of Vieques. This does not appear from the evidence that the Central Playa Grande would lose on its contracts for Noble cane under present prices for sugar in New York for the year 1937–38, or that the present low prices will continue. The District Court, in considering this assignment, stated in his opinion:

"It is quite generally known that with the present market price of sugar many centrals operating in the Island of Puerto Rico will show practically no profit this year. I am impressed with the idea that it is the market price of sugar which is primarily responsible for any loss which

Central Playa Grande will sustain on the present year's operation."

In other words, the court was not satisfied that in the future higher prices in New York for sugar would not result in profit for the Central Playa Grande. As is the case with so many farm products, droughts, winds and cost of labor often affect the price of staple farm products. It is therefore inevitable that profits from farm products will vary from year to year.

The District Court further states in its opinion: "Act No. 112 simply forbids grinding contracts at the rates of compensation to the colono less than those fixed in the Act." The District Judge held that: "The Legislature of Puerto Rico has power to regulate such contracts and in so doing it does not deprive centrals or other parties in interest of the equal protection of the law, and that the provisions or regulations do not compel centrals to enter into contracts the performance of which will result in loss. With the policy of the law or its provisions, the courts have no concern unless the Act is such as to deprive parties in interest of the equal protection of the law or offend against other well established principles which need not be stated here."

The third proposition advanced by the receiver (under his assignments of error) is that:

"Whether the Act be construed as fixing a price for the purchase of sugar cane or a law establishing maximum tolls for processing sugar cane it is confiscatory of the property of Benitez Sugar Company. This contention I have already answered. In this connection, however, it should be borne in mind that under the Act centrals are free to contract with colonos as to the percentage of cane yield which shall belong to each except as to the variety designated as Noble Cane. The testimony shows that practically 40 percent of colono sugar cane grown on the Island of Vieques is of a variety other than Noble Cane, and therefore not subject to the terms of Act No. 112.

"The evidence shows that prior to the passage of Act No. 112, Central Playa Grande had a contract with its colonos by which each colono received 140 pounds of sugar for each ton of Noble Cane delivered. On the basis of the yield over a considerable period in Vieques this was more than 65 percent of the actual yield of colonos cane. Such a contract would no doubt result in a loss to the central [to

the Central Playa Grande] at the present time due to the present low price of sugar. It is quite generally known that with the present market price of sugar many centrals operating in the Island of Puerto Rico will show practically no profit for this year. I am impressed with the idea that it is the market price of sugar which is primarily responsible for any loss which Central Playa Grande will sustain on the present year's operation.

"Finally it is contended that Act No. 112 is arbitrary and discriminatory and consequently an unlawful and unconstitutional exercise of legislative power. I am unable to see any basis for the allegation that the Act is discriminatory. It applies to all grinding contracts within Puerto Rico. It undoubtedly applies to the Island of Vieques just as it does to the Island of Puerto Rico. It applies to colonos and centrals in Vieques just as it does to colonos and centrals in Puerto Rico. There would be some basis for the charge of discrimination if the Act required Central Playa Grande to deliver to its colonos the same number of pounds of sugar for each ton of cane as is given in other centrals, because the evidence clearly establishes the great difference in variety and conditions under which the 43 or more sugar centrals in Puerto Rico operate. It is established that the grinding capacity of centrals in Puerto Rico varies from 500 tons daily in a small central to 8,000 tons daily in a large central. It costs less to grind or process a ton of cane in a mill of large capacity than in one of smaller capacity. The average percent of the sugar yield of cane is much larger in the cane delivered in some centrals than in others so that the average number of pounds of sugar obtained from a ton of cane varies in different localities, the pounds per ton being much larger in some centrals than in others. There is a difference also in labor cost. The cost of transportation of cane and of sugar also varies. Varieties of cane differ. Weather conditions are not the same in the territory of all centrals. But where is the basis for the charge of discrimination? The Act provides that colonos shall receive not less than 65 percent of the yield of cane of the Noble variety and are left free to contract as to the percentage of other varieties of cane. If in any particular locality the yield of cane per ton is less than another locality, the colonos receive proportionately less for their cane.

"As already indicated, if the act undertook to require Central Playa Grande to pay to its colonos a definite amount in either cash or in sugar, which amount would be wholly unjustified by the yield of cane in Vieques, there would be something to sustain this charge. Under the terms of the Act if a particular cane yields little, the colono receives little; if it yields much, he receives much. If centrals liquidate with the colono in money, they must do so on the basis of the price of sugar obtained in the New York market during the fortnight or month in which the cane is delivered and not on the basis of the actual selling price. However, it must be remembered that the central is not required to liquidate in money. A liquidation may be made in sugar and whether the colonos can ship said sugar to the New York market is immaterial.

"Neither do I feel that the Act is arbitrary in that it assumes the cost of manufacture to be the same in every central. It is very difficult to find uniformity in manufacturing costs in different manufacturing plants if we assume the plants to be of equal capacity and of equal equipment. This is due in many cases to efficiency or inefficiency in management. Some managers are able to take advantage of economies in production that are overlooked by others."

The underlying principles are, as was said with relation to wage laws by Chief Justice Hughes in the West Coast Hotel Company case, West Coast Hotel Co. v. Parrish, 300 U.S. 379, 57 S.Ct. 578, 584, 81 L.Ed. 703, 108 A.L.R. 1330:

"That while in individual cases, hardship may result, the restriction will enure to the benefit of the general class of employees on whose interest the law is passed, and so to that of the community at large."

In Nebbia v. New York, 291 U.S. 502, pages 537, 538, 54 S.Ct. 505, 516, 78 L.Ed. 940, 89 A.L.R. 1469, dealing with the New York statute providing for minimum prices for milk, the general subject of the regulation of the use of private property and of the making of private contracts received an exhaustive examination. The Supreme Court again declared that:

"If the laws passed are seen to have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory, the requirements of due proc-

ess are satisfied. * * * With the wisdom of the policy adopted, with the adequacy or practicability of the law enacted to forward it, the courts are both incompetent and unauthorized to deal. * * * Times without number we have said that the Legislature is primarily the judge of the necessity of such an enactment, that every possible presumption is in favor of its validity, and that though the court may hold views inconsistent with the wisdom of the law, it may not be annulled unless palpably in excess of legislative power."

The two formulae proposed in the Act for determining the sugar content of the cane are optional with the grower. Both are in use and are recognized by the sugar chemists as authoritative. We fail to see how authorizing the use of either formula can be considered arbitrary or discriminating, especially since 40 percent of the sugar grown in the Island of Vieques may be contracted for by the colonos, as the growers have been wont to do.

All colonos are treated alike in respect to the option allowed.

As the District Court said, no central is required to grind cane, though it might, of course, result in hardship, both upon the owner of the central and the colonos on the Island of Vieques. The price of sugar in New York may fluctuate and an increase in price may result in the future in a profit to the Central Playa Grande. In case the Receiver finds there is no hope for improved conditions in the future, and the situation reaches a point where the Central cannot hope to recover under the conditions deemed fair by the Puerto Rican Legislature to the other centrals on the Island of Puerto Rico, and the Act No. 112 is essential to the benefit of the greatest number, then the Central Playa Grande may have to be reorganized upon conditions that will enable it to return a profit, or be liquidated as being unable to continue at a profit.

The District Court made certain findings of fact which this court accepts, as it does not appear that its findings were clearly wrong, or do not rest on substantial evidence.

The decree of the District Court denying a permanent injunction against Benigno Fernandez Garcia, Attorney General of Puerto Rico, et al., from enforcing Act No. 112 of the Legislature, is affirmed with costs of appeal.