[No. 8,896. In Bank.—September 10, 1884.]

DANIEL MEYER, PETITIONER, v. JOHN Q. BROWN ET AL., RESPONDENTS.

MANDAMUS — CONTRACT — BONDS. — An act of the legislature abolished the corporation known as "the mayor and common council of the city of Sacramento," and vested its property and rights in a corporation named the "city and county of Sacramento." The act provided for the issuing of bonds of the city of Sacramento for the funding and payment of the debts of the city, that fifty-five per cent of the municipal revenues derived from certain named sources be set apart and appropriated as an interest and sinking fund for the payment of the bonds, and that a tax be levied upon the property within the city limits for that purpose. A subsequent act of the legislature created the "city of Sacramento," a municipal corporation, and made it the legal successor of the city and county of Sacramento. *Held,* that it was the duty of the new corporation to levy and collect the tax for the payment of the principal and interest of the bonds, and that mandamus will lie to compel the levy.

MUNICIPAL BONDS — ILLEGAL ISSUE — BONA FIDE HOLDER. — Bonds of a city, issued, signed, and authenticated as required by the act authorizing their issue, are valid claims in favor of a *bona fide* holder, although there may have been irregularity or fraud on the part of the agent of the municipality in issuing the bonds.

ORIGINAL APPLICATION for a mandamus to compel the defendants, trustees of the city of Sacramento, to levy a tax for the payment of certain municipal bonds. A demurrer to the petition was filed. The demurrer was overruled in September, 1883, and leave given to the defendants to answer. When the answer was filed, the case was referred to a referee, and upon the report of the referee, the court ordered the writ to issue as asked Subsequently a motion for a new trial was heard and denied.

The facts appear in the opinion of the court overruling the demurrer. The decision upon the merits, rendered June 4, 1884, and the opinion upon the refusal of the motion for a new trial, filed September 10, 1884, are given below in consecutive order.

*S. C. Denson,* and *Rosenbaum & Scheeline,* for Petitioner.

*W. A. Anderson,* and *McKune & George,* for Respondents.

Ross, J. — On the 27th day of February, 1850, the legislature of the State passed an act, by which it was declared that all that tract of land lying within certain designated limits should thereafter be known by the name of Sacramento City, for the government of which there should be a mayor, recorder, and council to consist of nine members, one of whom should be elected president; that the mayor, recorder, and councilmen should be a body politic and corporate by the name and style of " the mayor, recorder, and common council of Sacramento City," and by that name they and their successors should be known in law, have perpetual succession, sue, and be sued, in all courts, and in all actions whatsoever, etc. (Stats. 1850, pp. 70, *et seq.*) By an Act passed March 26, 1851, the legislature declared that the same territory should thereafter be known by the name of the " city of Sacramento," for the government of which there should be a mayor, recorder, and council to consist of nine members; that the mayor, recorder, and councilmen should be a body politic and corporate by the name and style of the " mayor and common council of the city of Sacramento," and by that name they and their successors should be known in law, have perpetual succession, sue, and be sued, in all courts and actions whatsoever, etc. By the seventh section of the act last mentioned the council was, among other things, given power to cause the streets to be cleaned and repaired; to provide for the making and improving of sidewalks; to lay out, extend, alter, or widen streets and alleys; to alter, improve, keep, and repair, and have full control of the levee; to establish and regulate a police, to be subject to the supervision of the mayor; to make appropriations for any object of city expenditure; to erect and maintain poor-houses and hospitals for the support of the indigent, sick, and insane; to prevent the introduction and spreading of diseases; to erect, repair, and regulate wharves; to provide for the prevention and extinguishment of fires, etc.

On the 24th of April, 1858, the legislature passed an act consolidating the city and county governments, the first and second sections of which are as follows:—

"Section 1. For the government of that territory now known as the city and county of Sacramento, there shall be a board of supervisors; and the said board of supervisors and their successors in office shall be a body politic and corporate under the name and style of 'the city and county of Sacramento,' and by that name they shall be known in law; may make, have, keep, alter, and renew a common seal, different and distinct from the seal of the county clerk; shall have perpetual succession; may sue in all courts, and in all actions whatsoever; may, under the limitations hereinafter provided, purchase and hold real estate or personal property, and receive and hold the same by legacy or donation for the city and county, or in trust for the use of public schools, or the fire department, or for a poor-house and indigent sick; and they may do all such other things, and exercise all such other powers, as by this act or by any other law are or may be granted or allowed to them to do; but the city and county shall not be sued in any action whatever, nor shall any of its lands, buildings, improvements, property, franchises, taxes, revenues, actions, choses in actions, and effects be subject to any attachment, levy, or sale, or any process whatever, either mesne or final.

"Section 2. The city and county of Sacramento is hereby made and constituted the successor of the corporation by this act dissolved, and heretofore known as 'the mayor and common council of the city of Sacramento.' The lands, public and private buildings, property, rights of property, actions, rights of actions, moneys, revenues, income, and trust, now vested in, or belonging, or in any wise appertaining to the corporation known as 'the mayor and common council of the city of Sacramento,' are hereby transferred to and vested in, and are declared to appertain and belong to the city and county of Sacramento, as hereinafter provided."

Sections 37, 38, 34, and 35 of the Consolidation Act are as follows:—

"Section 37. For the purpose of liquidating, funding, and paying the claims against the city and county of Sacramento, hereinafter specified, the treasurer shall cause to be prepared suitable bonds of the county of Sacramento, not exceeding the sum of six hundred thousand dollars, and for the city of Sacra-

mento, not exceeding the sum of one million six hundred thousand dollars, bearing interest at the rate of six per cent per annum from the first day of January, one thousand eight hundred and fifty-nine, and payable at the office of the treasurer. Said claims shall be funded in the order of their reception; shall, in the order of reception, be entitled to the shortest time; and one fourth of the whole amount made payable on the first day of February, one thousand eight hundred and eighty-eight; one fourth on the first day of February, one thousand eight hundred and ninety-three; one fourth on the first of February, one thousand eight hundred and ninety-eight; and the balance on the first of February, one thousand nine hundred and three. The interest on said bonds shall be made payable at the office of the treasurer on the first day of January of each year, said bonds shall be signed by the president of the board of supervisors, countersigned by the clerk of the board of supervisors, and indorsed by the treasurer, and shall have the seal of the city and county affixed thereto. Coupons for the interest shall be attached to each bond, so that they may be removed without injury to the bond; said coupons, consecutively numbered, shall be signed by the treasurer. It shall be the duty of the book-keeper of the city and county, and the treasurer, each, to keep a separate record of all bonds issued, showing the number, date, and amount of each bond, to whom issued, upon what claim, and its amount; and none of the claims herein specified shall be liquidated or paid except in the manner herein provided.

"Section 38. The following claims shall be received and funded under the provisions of this act: *First.* All legal debts or liabilities against the county of Sacramento, which may be unpaid and unprovided for by this act on the first day of January, one thousand eight hundred and fifty-nine. The annual interest and principal of all bonds issued for claims mentioned in this section shall be paid from the interest and sinking fund, as provided in section 36, and in the manner otherwise provided in this act. *Second.* All legal debts or liabilities against the city of Sacramento, which may be unpaid and unprovided for by this act, on the first day of January, one thousand eight hundred and fifty-nine. The annual interest and principal of all bonds issued for claims against said city shall

be paid from the interest and sinking fund, provided in section 35, and in the manner otherwise provided in this act.

"Section 34. The board of supervisors shall not have power to levy any greater taxes than as follows, viz.: On the real and personal estate, except such as is exempt by law, throughout the city and county, a tax of one hundred cents on the one hundred dollars; such State taxes as the laws may require, and in addition thereto, they shall levy, for municipal purposes, on all real and personal property within the city limits, except such as is exempt by law, a tax of one hundred cents on the one hundred dollars; also, a tax for road purposes of five cents on the one hundred dollars, on the property outside the city limits. All of which taxes shall be levied and collected strictly in accordance with the revenue laws of the State, except as may be otherwise provided in this act; *provided*, that nothing contained in this section shall prevent the board of supervisors from levying, in addition, a tax in accordance with an act passed February (March), one thousand eight hundred and fifty-eight, entitled an act to amend an act, passed April twenty-seventh, one thousand eight hundred and fifty-seven, entitled an act to submit to the people of the counties of Sacramento and El Dorado, a proposition for the construction of a wagon road.

"Section 35. The revenue derived from and within the city limits, for municipal purposes, viz., taxes, licenses, harbor dues, water rents, and fines collected in the mayor's court, or otherwise, when paid into the treasury, shall be set apart and appropriated as follows: Fifty-five per cent to an interest and sinking fund, which shall be applied to the payment of the annual interest and the final redemption of bonds issued for city indebtedness, in accordance with the provisions of this act; fifteen per cent to a salary fund, which shall be applied to the payment of the salaries of municipal officers as provided in this act; eight per cent to a school fund, which shall be applied to the support of schools within the city limits; and the balance, twenty-two per cent, to a fund to be used for all such necessary municipal expenses as are not otherwise provided for in this section, and shall be called the contingent fund."

By the second section of the act of consolidation, all of the property and rights theretofore belonging or pertaining to the

corporation known as "the mayor and common council of the city of Sacramento," were vested in, and declared to appertain and belong to the consolidated government. But in dissolving the old city government and transferring all of its property and rights to a new corporation, the legislature did not forget that there were outstanding claims against the old one. Recognizing that fact, it made provision in and by the act of consolidation for "liquidating, funding, and paying" those claims. Suitable bonds were directed to be prepared for the city of Sacramento, not exceeding one million six hundred thousand dollars, with interest coupons at the rate of six per cent per annum, payable on the 1st day of January of each year, with which the legal claims against the old city government were to be paid and discharged. To pay the interest as it should accrue and to redeem the bonds, it was provided by the act of consolidation that fifty-five per cent of the revenue derived from and within the city limits for municipal purposes, that is to say, taxes, licenses, harbor dues, water rents, and fines collected, should be set apart and appropriated to an interest and sinking fund, which should be applied to the payment of the annual interest and the final redemption of the bonds; and the governing body of the consolidated government, viz., the board of supervisors, was required to levy for municipal purposes, on all real and personal property within the city limits, except such as is exempt by law, a tax of one hundred cents on the one hundred dollars.

Having thus made provision for the payment annually of the interest on the bonds, and ultimately for their redemption, the legislature offered them in payment of the legal claims against the old city government. The offer was accepted, and the holders of the latter surrendered their claims, in consideration of which the consolidated government issued to them its bonds, pursuant to the provisions of the act. The bonds carried with them the pledge of an annual tax for municipal purposes, on all real and personal property within the city limits, except such as is exempt by law, of one hundred cents on the one hundred dollars, fifty-five per cent of which to be set apart and appropriated to an interest and sinking fund, to be applied to the payment of the annual interest upon the bonds, and to their final redemption. The tax was the chief security offered the creditors

as an inducement to accept the bonds in payment of their claims. When the bonds for whose payment, with interest, provision was thus made, were issued and accepted by the creditors of the old city government, a contract was made as solemn and binding and as much beyond subsequent legislation as it would have been if made between private persons. These views will be found sustained and amplified in an able opinion recently rendered by the Supreme Court of the United States, in a case entitled *Louisiana* v. *Pilsbury*, reported in 105 U. S. p. 278. It is well occasionally to recall the fact that there is no more reason to permit a municipal government to repudiate its solemn obligations entered into for value, than there is to permit an individual to do so. Good faith and fair dealing should be exacted of the one equally with the other.

Some minor objections are made to the petition, which is for a writ of mandate, compelling the city authorities to levy the tax referred to, none of which, in our opinion, are well taken.

Demurrer overruled and defendants allowed ten days within which to answer.

McKINSTRY, J., MYRICK, J., SHARPSTEIN, J., THORNTON, J., and McKEE, J., concurred.

The COURT. — We are satisfied with the opinion delivered when this case was considered on demurrer to the petition. (The preceding opinion, by MR. JUSTICE ROSS.) The views then expressed are decisive of the case as now presented in favor of the petitioner. It is therefore ordered that a writ of mandate issue to the municipality, and its authorities annually to levy and collect for municipal purposes on all real and personal property within the city limits, except such as is exempt by law, a tax of one hundred cents on the one hundred dollars, and that fifty-five per cent of the revenue thus derived within the city limits for municipal purposes be set apart and appropriated to an interest and sinking fund, to be applied to the annual interest and final redemption of the bonds issued for the city indebtedness, in accordance with the act of the legislature of the State, adopted April 24, 1858.

The COURT. — This is a motion for a new trial. At the trial

before the referee defendants offered to prove facts, which, it is claimed, would have shown that certain of the bonds described in the complaint herein, the payment of which is sought to be enforced by the mandate of this court, were issued in consideration of the surrender of bonds, purporting to represent indebtedness of the city of Sacramento, which bonds (last named) had been illegally issued, and did not constitute valid claims against the said city.

It is contended by the defendants that the referee erred in rejecting the evidence offered.

We deem it unnecessary to inquire whether, assuming the facts to be implied by the defendants' offer of evidence, the bonds, in lieu of which the bonds in suit were issued, were invalid. True, the Act of 1858 (Stats. 1858, p. 280), provided that all "legal" claims might be funded, but, as we understand the provisions of that act, the president of the board of supervisors, the clerk of the board, and the treasurer were authorized to determine, on behalf of the city and county of Sacramento, the legality of each claim presented, and, if satisfied of its legality, to issue a bond or bonds therefor. Even if the evidence offered would have shown that the officers mentioned violated their duty by deciding some claims to be legal which they knew were illegal, there was no offer to prove that the claims, alleged to be the consideration for the bonds sought to be enforced by this proceeding, were presented by plaintiff, or that any of such bonds issued to him. There is no averment in the answer, nor is there any finding in the record, or any evidence tending to prove, that plaintiff is other than a holder *bona fide* of the bonds. The bonds recite that they were issued in accordance with the law of 1858; they and the coupons attached are signed and authenticated as required by that law. They are exactly such bonds as would have been authorized had the officers of the city and county indisputably allowed only "legal debts and liabilities" of the former corporation — the city of Sacramento. At the trial, the *bona fides* of the plaintiff being conceded, there was but one question to be decided, to wit: Were the bonds such as the city and county had power to issue? No question of irregularity, or even fraud, on the part of the agents of the municipality, could be considered. (*Roneden* v. *Jersey City*, 17 Rep. 253; *East Lincoln* v. *Davenport*, 94 U. S.

801; *Pompton* v. *Cooper Union,* 101 U. S. 196; *Sherman* v. *Simmons,* 109 U. S. 737; *Louisiana* v. *Pilsbury,* 105 U. S. 278.)

Hereafter, in cases like the present, where the facts shall be found by a referee appointed by this court, and either party shall have given notice of a motion for a new trial within ten days after receiving notice that findings have been filed, the argument of the cause will not be heard until the motion for a new trial shall have been determined. Nor will argument be heard upon the findings of a referee (no notice of motion for a new trial having been served), unless ten days shall have expired after notice of the filing of such findings.

Motion denied.