## BATES v. GREGORY et al.[*]

### No. 13,168; November 30, 1889.

#### 22 Pac. 683.

**Municipal Bonds—Subsequent Statute Affecting Purchasers.—** Act of March 26, 1851 (Stats. 1851, p. 391), incorporating the city of Sacramento, and investing it with authority to sue and be sued, and acts of April 26, 1853 (Stats. 1853, p. 117), and April 10, 1854 (Stats. 1854, p. 196), authorizing the issuance of bonds of the city,

---

[*]For subsequent opinion in bank, see 89 Cal. 387, 26 Pac. 891.

gave the purchaser of such bonds the right to sue the city if they were not paid when due; and this right could not be impaired by subsequent legislation.

**Municipal Bonds—Funding—Limitation of Actions.**—Act of March 22, 1864 (Stats. 1864, p. 217), entitled an "Act to provide for the liquidation of the indebtedness of the city of Sacramento which accrued prior to January 1, 1859," and empowering the board of trustees of the city to issue new bonds, in liquidation, to all holders of claims against the city, was passed merely for the purpose of completing the funding of the city's indebtedness, and did not withdraw claims, existing before the passage of the act, from the operation of the statute of limitations; and an action for mandamus to compel the board of trustees to issue bonds, as therein provided, in place of those issued by the city under acts of April 26, 1853, and April 10, 1854, cannot be maintained where such bonds have since the act of 1864 become barred by the statute of limitations.

Thornton, J., dissenting.

APPEAL from Superior Court, Sacramento County; John Hunt, Judge.

A. C. Freeman and W. C. Belcher for appellant; A. P. Catlin for respondents.

FOX, J.—This was an application for a writ of mandate to compel the defendants, as trustees of the city of Sacramento, to issue to petitioner new bonds of the city in accordance with the provisions of the act of March 22, 1864, in exchange for unpaid bonds held by him, which were issued under the provisions of the acts of April 26, 1853, and April 10, 1854. The defendants, in their answer, and upon the trial, contended that the claims were stale, and barred by the statute of limitations. This contention prevailed, and resulted in a judgment for the defendants, from which, and an order denying a new trial, plaintiff appeals.

March 26, 1851, the city of Sacramento was incorporated by an act of the legislature, passed on that date, entitled "An act to incorporate the city of Sacramento": Stats. 1851, p. 391. By this act the government of the city was placed in the hands of a mayor, recorder, and a common council, who were constituted a body politic under the name of the "Mayor and Common Council of the City of Sacramento," with authority to sue and be sued; to borrow money, and pledge

the faith and credit of the city therefor; and to levy and collect taxes. April 26, 1853, another act was passed entitled ''An act to extend and better define the powers and duties of the common council of the city of Sacramento, and to authorize the establishment of free schools in said city'' (Stats. 1853, p. 117), which conferred upon the mayor and common council the power to issue bonds for the purpose of raising funds to pay the then existing indebtedness of the city. In the exercise of the power thus granted, the mayor and common council of the city of Sacramento issued a certain bond dated the sixth day of May, 1854, and numbered 418, for the sum of $544.45, and made payable to Jonathan Williams or bearer on the first day of July, 1874, unless sooner called in, together with forty semi-annual coupons thereto attached for $27.22 each. Another act was passed April 10, 1854, entitled ''An act authorizing the mayor and common council of the city of Sacramento to issue bonds for certain purposes'' (Stats. 1854, p. 196), under which the mayor and common council of the city of Sacramento issued two certain bonds for the sum of $1,000 each, respectively numbered 361 and 384, and dated 24th and 26th of April, 1854; and attached to each bond were forty semi-annual coupons for $50 each. Both bonds were made payable on the first day of July, 1874, unless sooner called in. Bond No. 361 was made payable to Edward McGowan or bearer, and No. 384 to Stow and English or bearer. April 24, 1858, another act was passed, which consolidated the city of Sacramento with the county, under the corporate name of the ''City and County of Sacramento.'' This act vested all the revenue and property of the city of Sacramento in the consolidated government, and provided for the funding of all claims existing against the city on the first day of January, 1859, and fixed the time at June 1, 1859, within which the holders of such demands might present them for funding. This time was thereafter extended to the first day of October, 1859 (Stats. 1859, p. 359), and subsequently to January 1, 1862 (Stats. 1861, p. 308). April 25, 1863, an act entitled ''An act to incorporate the city of Sacramento'' (Stats. 1863, p. 415) was passed, creating the present ''City of Sacramento.'' This last act provided, among other things, that all the property and revenue which belonged to the mayor

and common council of the city of Sacramento on the thir-
tieth day of April, 1858, should become the property of the
city of Sacramento, and that it should have power to sue
and be sued, and defend, upon any obligation; provided, that
such obligation was. not made or entered into prior to the
passage of the act. On the twenty-second day of March,
1864, an act was passed entitled ''An act to provide for the
liquidation of the indebtedness of the city of Sacramento
which accrued prior to January 1, 1859'' (Stats. 1864, p.
217). By this last act the board of trustees of the city were
empowered to issue to all holders of claims against the city
which accrued prior to January 1, 1859, bonds payable to
bearer on February 1, 1903, to bear date of May 1, 1864,
and bear interest from January 1, 1859, at six per cent per
annum, payable annually, after the first six years, on the
first day of January, at the office of the city treasurer. The
act prescribed no time within which creditors should present
their demands for liquidation, but provided that bonds should
be issued for all claims which accrued prior to January 1,
1859, that the board of trustees, upon examination, should
consider ''legal and just.''

The petitioner, on October 17, 1887, presented the three
bonds above described to the defendants for funding, and
demanded in lieu thereof, under the act of 1864, the issuance
of bonds to him equal in amount to the principal and inter-
est due on the bonds which he offered to surrender. This
demand was refused by the defendants. The appellant, upon
these facts, argues that the statute of limitations was sus-
pended by the acts of 1858, 1863, and 1864, as to all persons
holding claims who might choose at any time to accept their
provisions; and that the act of 1864 is a continuing offer held
out to the creditors of the city of Sacramento which can only
be withdrawn by a repeal of the act; and all who have claims
such as are mentioned in the act, and accept its terms, can
enforce the funding of their obligations by mandamus. It
is conceded by respondents that mandamus is the proper
remedy, if the claims of the petitioner are not stale or barred.

The act of incorporation of the city of Sacramento of 1851,
and the acts of 1853 and 1854, under which the bonds of
petitioner were issued, expressly authorized suits against the
corporation upon such obligations. The inhibition of the act

of 1858, in the first section thereof, is that "the city and county shall not be sued in any action whatever, nor shall any of its lands, buildings, improvements, property, franchises, taxes, revenues, actions, choses in action, and effects be subject to any attachment, levy, or sale, or any process whatever, either mesne or final"; and that prescribed in the first section of the act of 1863 is that the city may "sue and be sued, and defend, upon any bond, covenant, agreement, contract, matter, or thing whatever, of which courts of law or equity have jurisdiction: provided, however, that such bond, covenant, agreement, contract, matter, or thing that is the cause of action has been made or entered into after the passage of this act." These inhibitions clearly applied only to obligations of the city and county and city respectively, incurred after the passage of the several acts. The restriction in the first act was to prevent the city and county of Sacramento from being sued upon any obligation incurred by it as such; and that in the second act, to protect the city of Sacramento against suits upon claims for which the former city and county had alone become liable. The act of 1864 did not enlarge or affect these restrictions in any way, The rule is, as stated by Judge Dillon in his work on Municipal Corporations (volume 1, section 69), that "if a municipal corporation becomes indebted, the rights of the creditors cannot, it is clear, be impaired by any subsequent legislative enactment": Meyer v. Brown, 65 Cal. 583, 4 Pac. 25, 625, 26 Pac. 281. The bonds of petitioner were issued under the acts of 1853 and 1854, under which the city could sue and be sued, and the privilege to sue thereby became a part of and entered into the contract of the city with the holders of such bonds. Petitioner's bonds are therefore within the above rule, and the protection of the state and federal constitutions, which prohibit the passage of laws impairing the obligations of contracts; therefore the right to recover upon the bonds by suit after they matured remained unaffected by the acts of 1858 and 1863. If, however, the petitioner had surrendered his bonds under the acts of 1858 or 1864, in exchange for those provided for in said acts, the inhibition against suing thereon, contained in the act of 1858, would have become as much a part of the new contract thus created as the privilege to sue granted by the acts of 1851, 1853, and

1854 did of the bonds in question here: Kennedy v. City of Sacramento, 10 Saw. 33, 19 Fed. 580; Meyer v. Porter, 65 Cal. 67, 2 Pac. 884; and Meyer v. Brown, supra.

The claim of petitioner, that the act of 1864 was a continuing offer which he could take advantage of at any time before such offer should be withdrawn by repeal, cannot be supported. The purpose of the legislators in passing the act of 1864 was merely to complete the funding of the city indebtedness, not to withdraw claims founded on such indebtedness from the operation of the statute of limitations. This is manifest when the act is construed in connection with the legislation bearing on the same subject, beginning with the act of 1858; all of which show a complete plan to fund and adjust certain indebtedness of the city. As an inducement for its creditors to co-operate with it in the accomplishment of this object, the act of 1858 held out the opportunity, if taken advantage of before June 1, 1859, subsequently extended to January 1, 1862, to obtain bonds in exchange for the old ones, in one of four classes, that would run, respectively, until 1888, 1893, 1898, and 1903, dependent upon the order of issuance. These bonds would run from fourteen to twenty-nine years longer than the old bonds, and would draw interest at the rate of six per cent per annum, payable annually, and carried with them the pledge of an annual tax for municipal purposes, and an interest and sinking fund to pay the interest on the bonds as it accrued, and to effect the redemption of the bonds at maturity. The same opportunity was again renewed by the act of 1864, except that all new bonds issued thereunder were to run until 1903, or twenty-nine years longer than the bonds held by petitioner; and the interest would be payable from January 1, 1859, and annually after the first six years. The benefit of the interest and sinking fund was a material advantage that could be gained by a surrender of the old bonds, as they were mere naked promises to pay, for which the general faith and credit of the city alone was pledged, and upon which the payment of interest stopped in 1858; no provision for the payment thereof having been made in the act of 1858, or any subsequent legislation, which we think is a circumstance showing a desire on the part of the legislature to compel creditors to fund their claim. Therefore, to say that the act of 1864 was intended

to withdraw all claims therein mentioned from the operation of the statute of limitations would be to ignore the object of the legislation referred to, and encourage the holders of such claims to defeat the efforts of the city to adjust and fund its indebtedness. Besides, as the bonds of petitioner had yet ten years to run before maturing, when the act of 1864 was passed, there was no necessity for a suspension of the statute of limitations; and, aside from what seems to us to be the object of the act, it is not reasonable to impute to the legislators who passed it an intention to provide for a necessity which did not exist, when they failed to give any expression in their act from which such an intention might be inferred. Again, it is a well-settled rule that the repeal of statutes by implication is not favored, and we are of the opinion that the same principle should apply with equal force to the suspension of the operation of statutes. It was, of course, optional with the petitioner to exchange the bonds or not; but having refused to exchange them from 1858 to 1874, and waited thirteen years longer before offering to do so, his right to have his bonds funded is now barred, if it is within the provisions of sections 337 and 338 of the Code of Civil Procedure, pleaded in defendant's answer to his petition.

The Code of Civil Procedure (section 337) provides that an action must be commenced within four years "upon any contract, obligation, or liability founded upon an instrument in writing executed in this state." When petitioner, by his assignors, accepted the bonds from the city of Sacramento, a contract was thereby created between them whereby the city became obligated to pay the principal and interest of the bonds on or before the first day of July, 1874. This contract, it will be observed, was in writing, and was evidenced by the bonds. The right to maintain an action upon the bonds after July 1, 1878, four years after the maturity thereof, therefore depended upon whether the plea of the statute of limitations would be made. The statute of limitations is a personal privilege that may be used as a means of defense by pleading it; otherwise, it is waived: Grant v. Burr, 54 Cal. 298. In this case this defense was not waived, the defendant having specially pleaded the bar of said section 337, and it constitutes a complete defense to this action. It fol-

lows that the judgment and order appealed from must be affirmed.   So ordered.

We concur: McFarland, J.; Sharpstein, J.; Works, J.; Paterson, J.

Beatty, C. J., took no part in the decision of the above cause

THORNTON, J.—I dissent.   The proceeding herein is not barred by the statute of limitations.   The Code of Civil Procedure classifies the procedure in this case as a special proceeding of a civil nature: See Code Civ. Proc., pt. 3, p. 371. The contents of the page just cited are a part of the code (Sharon v. Sharon, 75 Cal. 16, 16 Pac. 345), and define the character of the procedure mentioned in part 3 of the Code of Civil Procedure.   The right to commence this proceeding did not exist until a demand was made for the issuance of bonds to the petitioner, and its refusal by the board of trustees of the city of Sacramento.   The demand and refusal were made but a few days before this proceeding was begun.   No statute of limitations that we know of effected a bar herein.   Nor were the bonds of a former issue held by petitioner barred by the statute of limitations.   This was, in fact, determined by the case of Underhill v. Trustees, 17 Cal. 177, which applies with all its force to this case.   The court, in its opinion, by Baldwin, J., states the case in relation to the defense of the statute of limitations, and disposes of it.   The court said: ''The important question is that arising under the statute of limitations.   The bonds upon their face are payable at dates which show a bar under the general statute.   But the plaintiff, to avoid the bar, sets up several acts of the legislature applicable to this corporation, which he alleges are sufficient to take the case from the influence of the statute.   The bonds are dated 25th of March, 1853, and due two years afterward. The first of these acts was passed March 9, 1855, and is entitled 'An act to reincorporate the city of Sonora'; at this time the bonds were not barred.   The tenth section provides that the trustees shall have power, and it shall be their duty, semi-annually to raise, by tax on the real and personal property within the city, a revenue of one per cent, etc.; and section 16 provides: 'In case the public debt is not liquidated at the expiration of three years, the trustees shall have power

to levy a sufficient tax, in addition to the one per cent authorized in section 10, to pay the outstanding debt.' The second section of the act of 1858 is in the same words, except that six years are specified instead of three. It is contended that this is not only a recognition of the existence of these debts by the legislative authority, but a provision for their payment. This provisional office of levying the tax, being a public duty of the officers of the corporation, cast upon them by the public law, carried with it a legal obligation to discharge it, which might doubtless have been enforced by appropriate proceedings. It afforded, in other words, a remedy to the bondholder for the enforcement of the claim as a valid money obligation. These acts were passed at the instance of the corporators, according to the averments of the complaint. With the assent of the city, this legislative recognition and provision are equivalent to the same acts done with full authority by the corporation. Indeed, we suppose they would be sufficient without such assent, by virtue of the control which the legislature possesses over these municipal bodies. The legislative acts, then, recognize the debt, and make provision for its payment. This is enough to withdraw the case from the operation of the statute. It is equivalent to a trust deed by the city, setting apart property out of which the money due was to be paid at a given time, if not sooner paid, upon a claim acknowledged to be an outstanding debt; and we cannot conceive of any principle of law or justice which would hold the claim to be barred by the statute merely because the creditor waited after this for his money. The plea of the statute, if successful, would, under these circumstances, be nothing less than an act of unqualified repudiation of a just and honest obligation, to the payment of which the faith and honor of the defendant are pledged. The respondent suggests, in justice to the city, that she is equitably entitled to set up this defense. We think the equities of the case, if there be any— of which we cannot now judge—must be set up in some other form.''

It has long been settled in this state that municipal corporations, of which the city of Sacramento was and is one, are parts of the state government, and entirely under the control of the legislature. The latter proposition here stated

was broadly true under the former constitution of this state,
during the existence of which the acts of the legislature re-
ferred to in this case were passed. Important restraints on
the legislative power were made in the present organic law;
but they have no bearing on the question before us, the acts
having been passed long before the present constitution went
into effect. As to the nature of a public municipal corpora-
tion, I refer to Payne v. Treadwell, 16 Cal. 220, where the
subject is fully and ably discussed. Many cases subsequently
decided approved the rulings there made, which can easily
be found by anyone familiar with the reports of the de-
cisions of this court. It is no longer a debatable question
with us that a municipal corporation can be a trustee. It is
in its essence a trustee of public trusts. The acts of the legis-
lature concerning the indebtedness of Sacramento, providing
for its funding, refunding and payment, create a trust for
the benefit of its creditors. The trust was an express one.
It created a fund for the payment of creditors, the proper
administration of which can be enforced, and should be en-
forced, in its letter and intent by the courts of the state. It
is unnecessary to recapitulate the provisions of that statute.
They have been fully and frequently stated in former de-
cisions of this court. The statute of limitations never runs
against an express trust until the repudiation of the trust by
the trustees. This is settled law in this state. The cases
which sustain this proposition are numerous. They may be
found cited and commented on in any work on the statute of
limitations: See Ang. Lim., secs. 166, 168, 169 et seq., 468,
469 et seq., where the cases are cited and fully discussed.
· See, also, Wood, Lim., in index, word "Trusts," where the
text is referred to, in which the cases are cited and discussed.
A common mode of creating express trusts is seen in the
cases of executors and administrators: Ang. Lim., sec. 168.
The retention of funds by them is consistent with their char-
acter, and they may be held to answer after a long period:
Sec. 168. The devise of land to trustees or executors is a
direct trust, and the statute does not run after the testator's
death: Ang. Lim., secs. 169, 468. Instances of express or
direct trusts are also seen in the case of assignees in bank-
ruptcy, who are trustees for creditors: Wood, Lim., p. 420,
sec. 202, and cases cited. See In re Leiman, 32 Md. 225,

where the rule is elaborately discussed. Other instances might be referred to, but the foregoing are deemed sufficient.

The trust in this case has never been, and it is confidently asserted cannot and should not be, repudiated. Nor is the trust a stale one. It is a continuing trust, lasting at least until 1903. That such a trust can be stale is a delusion. The decision in Underhill v. Trustees, 17 Cal. 173, is in line with the cases above referred to, and was ruled on the same principle. Where a direct trust is created, the trustee can only set the statute into action by repudiating the trust. The statute only commences to run from some unequivocal act of repudiation, and there is none such here. If there was an attempt to repudiate the trust as to the bonds involved in this proceeding, it occurred only a short time before it was commenced, and a sufficient time had not then elapsed to effect a bar. It should be observed that the acts of the legislature under which this funding was had abolished the corporation of the city of Sacramento, and created a new one entitled the "City and County of Sacramento." All the assets of the old were transferred by the acts referred to to the new corporation, and the creditor was forbidden to sue the new corporation on any of the old indebtedness, like that of petitioner here. Instead, he was permitted to fund his claims; to obtain new bonds for old. The old corporation had gone out of existence by a valid legislative enactment, and it is difficult to perceive how it could be sued. Can a nonexistent corporation be sued? It would seem not. A corporation is a person—an artificial one—and, if it has ceased to exist, it cannot be sued any more than a dead man can. It has met its death, and persons who have ceased to live are not judicial persons. They have no longer standing in a court of justice. Inasmuch as the old corporation had died, and the new one could not be sued by the petitioner on his own bonds, it would be highly unjust to hold it to be law that the statute of limitations ran against him on such bonds; but, whether he could sue or not, we have shown that by the operation of the acts of the legislature the statute did not, and could not, run on these old bonds against the creditor now asking the interposition of the court.

It may be contended that the writ of mandate is, with us, one retaining its character as a prerogative writ, to be issued

only in the sound discretion of the court (so held in Spring
Valley Waterworks v. San Francisco, 52 Cal. 117); and that
in the exercise of such discretion it should not issue in this
case, for the reason that the petitioner has waited so many
years before applying to exchange his bonds for new bonds
to be issued under the act or acts of the legislature referred
to by counsel. To the ruling in the case cited, as to the
nature of the writ of mandate, Justice Rhodes refuses to
accede, for reasons which seem to me very cogent. But it
will be here conceded that the decision in 52 Cal. is correct. I
think that for sound and controlling reasons this court is
called on to so exercise its discretion as to order the issu-
ance of the writ asked for herein, although the bonds pre-
sented by the petitioner were issued in 1854. The discre-
tion referred to is a judicial discretion. As said by Lord
Mansfield in Rex v. Wilkes, 4 Burr. 2539: "Discretion, when
applied to a court of justice, means sound discretion, granted
by law. It must be governed by rule, not by humor; it must
not be arbitrary, vague, and fanciful, but legal and regular."
Lord Kenyon, in Wilson v. Rastall, 4 T. R. 757, thus charac-
terizes it: "The discretion to be exercised . . . . [by a court
or judge] is not a wild, but a sound, discretion, and to be
confined within those limits within which an honest man,
competent to discharge the duties of his office, ought to con-
fine himself." Wallace, J., speaking for the court in Ex
parte Hoge, 48 Cal. 5, says of this discretion: "This 'dis-
cretion' to do 'justice' is not an arbitrary discretion to do
abstract justice, according to the popular meaning of that
phrase, but is a discretion governed by legal rules, to do
justice according to law, or to the analogies of the law, as
near as may be": 48 Cal. 5, 6. In Lybecker v. Murray, 58
Cal. 186, it is said: "Under no circumstances is the discre-
tion of the court to be exercised arbitrarily, but it is a dis-
cretion governed by legal rules, to do justice according to
law, . . . . as near as may be"; citing Ex parte Hoge and
Ex parte Marks, 49 Cal. 681. See, also, People v. Lewis, 64
Cal. 401–403, 1 Pac. 490. It will be observed that there is
no such thing as arbitrary discretion in the administration
of the law vested in courts of justice. The discretion, how-
ever broad it is, has its limitations as above pointed out. It
must be exercised with great care, within the defined limits,

always for the purpose of doing justice, never of doing or sustaining injustice. It must be exercised upon an anxious and careful consideration of all the circumstances surrounding the transaction or res gestae under consideration. Judicial responsibility is never more oppressive than when a matter of right is submitted to the discretion of a court. Therefore, it should be always careful to observe the limits which define it, heedful of the maxim, "misera est servitus, ubi jus est vagum aut incertum."

There are the strongest reasons in this case to induce this court to exercise its discretion in granting the prayer of the petitioner. In the first place, we have seen that the bonds of petitioner are not barred by any act of limitation, and it should not be so held. The case above cited from 17 Cal. is correctly decided, and solves this; nor are the coupons on such bonds barred—especially so held in Meyer v. Porter, 65 Cal. 67, 2 Pac. 884. See, also, Freehill v. Chamberlain, 65 Cal. 603, 4 Pac. 646. Provision is made by the acts of the legislature above alluded to for funding the bonds issued before the enactment by the city of Sacramento. The city was unable to meet its obligations, and time was granted to it by the operation of these acts. The creditors accepted the proposition to extend the time of payment of the debt before contracted, and received new bonds in exchange for old indebtedness. If there was any delay to present bonds issued in 1858 to be exchanged under the act for new bonds, certainly the city was not hurt by it, and the creditor did not lose his right to payment, or to receive new bonds, because he was indulgent and forbearing to the embarrassed debtor. As was said by Baldwin, J., in Underhill v. Trustees, supra: "We cannot conceive of any principle of law or justice which would hold the claim to be barred by the statute merely because the creditor waited after this [that is, after the passage of the act of the legislature] for his money." The bona fides of the bonds presented by petitioner is not impeached or assailed in any way. No fraud is hinted at in relation to them, nor to the indebtedness for which they were issued. The bonds were properly issued for actual existing indebtedness. They remained unpaid.

Further, such has been the conduct of the authorities of the city that it does not lie in their mouth to appeal to this

court so to exercise its discretion as to refuse the writ asked for. They continued for years after the passage of the acts to issue new bonds in exchange for the old ones without raising this question. It is so found by the court below. These exchanges of bonds amounted to the sum of $90,630. According to the finding (3), at the time of the passage of the act of March 22, 1864, there were outstanding unpaid claims against the city of Sacramento amounting to about $100,000, including the three bonds involved herein. After the passage of said act, up to and including the year 1880, the board of trustees of the city of Sacramento issued under the act of March 22, 1864, new certificates in exchange for old bonds of the city, and other demands accruing prior to the first day of January, 1859. The following new bonds are found to have been issued, under the act of 1864, in the year mentioned, and for the amounts named below, viz.:

| | |
|---|---:|
| In 1864........ ................... ............. | $21,642 |
| In 1865............... .................. ..... | 11,499 |
| In 1866........ ................... .......... | 5,754 |
| In 1867........ ................... .......... | 580 |
| In 1867..... ............ .......... ...... | 216 |
| In 1870............ ................ .......... | 3,113 |
| In 1872........ ............. .............. | 39,611 |
| In 1873..... ............ .............. ...... | 1,311 |
| In 1875.............. ............. ..... .... | 1,100 |
| In 1876..... ............... ........ ....... | 1,100 |
| In 1878.... ........... ............. ......... | 2,404 |
| In 1879......... ............ ........ ...... | 100 |
| In 1880......... .............. .......... .... | 2,200 |

The whole amounting to................... $90,630

Why, then, should the defendants here be allowed to invoke the exercise of discretion by courts, when year after year, up to 1880, they were funding the old bonds by issuing new ones in their stead? There is nothing in the act of 1864 to inhibit their being funded. No day is named in the act of 1864, as in the former acts, after which the old bonds then outstanding should not be funded, and the new bonds issued in their stead. The act of 1864 provided that bonds should be issued for all claims which accrued prior to the 1st of January, 1859, that the board of trustees should, on examina-

tion, consider legal or just. It is nowhere alleged or claimed or contended by defendants that the bonds of petitioner are not legal or just. The findings (1, 2, 3) of the court distinctly negative any such pretense or contention. Nor is it claimed or contended that the board of trustees refused to fund them because they were not legal or just. The failure to present them, under these circumstances, should not be allowed to operate against the holder. The trust was a continuing one, and the holder of the old bonds had a right to present them, and get new bonds in exchange, at any time during the continuance of the trust. The language is strong enough to amount to a mandate. It is to fund bonds found to be legal and just. We do not say that the conduct of the board constituted a technical estoppel on them, but it furnishes the strongest reason why its refusal to fund should not be regarded. It is said that, inasmuch as the act of 1864 did not prescribe a time within which the old indebtedness should be presented, it should be presented within a reasonable time after the passage of the act. This may be conceded. The bonds involved in this case were not presented in a reasonable time. Why were they not? It was during a continuance of a trust to last at least till 1903. It may be conceded that they could not be presented after 1903, though some of the bonds for the payment of which the debt was created might then have remained unpaid; but why could they not be presented before that time? The creditor here has certainly been conspicuously indulgent to an embarrassed debtor. Should he be punished for his kindness by losing his debt, honestly contracted, and honestly owing? This would be a strange position to assume in a court of justice. As the statute of limitations, under the act, could not run, it would be strange to hold, as was held in the court below, that the creditor was barred by laches. It is not a case where there was never a statute of limitations which could bar the debt. But for the legislation on the subject, the statute would run against bonds and coupons. But the legislature speaks with direct and undisguised tone, and in effect says, ''We have provided a mode by which you can have time to pay this debt, but you must not, and shall not, plead such statute.'' There was nothing unfair or unjust in this; on the contrary, it was just all around, when the

creditor consented, and was evidently helpful and beneficial to the embarrassed municipality.

Further, as the operation of the statute or of lapse of time were in effect and in reality suspended by the legislation regarding this indebtedness, we cannot perceive how laches could be predicated of the creditor under the facts of this case. It is held to be settled law in New York, under a statute of limitations substantially identical with the statute of this state, that laches cannot be held to take place when there is an existing statute of limitations applicable to the matter litigated; and properly so, for the reason that the doctrine of laches grew up in courts of equity in regard to matters in litigation because there was no statute of limitation applicable, and hence they proceeded on the ground of unexplained delay as evidence, and, by analogy to the statute, refused to enforce the claim because of laches or staleness of the demand sought to be enforced: See Derby v. Yale, 13 Hun (N. Y.), 277; Wood, Lim., sec. 62; and Morse v. Royal, 12 Ves. 373. And certainly no such reason as staleness of demand or laches can be held or assumed to exist, during the running of a continuous trust, years before its expiry, when, by the very meaning and intent of the settlement prescribed by the legislature, the operation of the statute of limitations is suspended, and is to cease running. The board of trustees are the trustees of the creditors for the payment of the indebtedness above referred to, with ample means of payment placed in their hands by the legislature. They can, under powers vested in them by the legislature, levy taxes on the property of the city to raise funds for such payments. They can do this every recurring year; and they have abundant property within the city, subject to their power to levy and collect taxes, to raise these funds during each recurring year. There is no excuse of inability to provide for the means of payment. The means to raise the funds necessary are amply sufficient, and at hand, right before their eyes; and accordingly the idea cannot be entertained for a moment that the taxpayers of Sacramento, owning ample taxables, are unwilling to pay the debts of their city government, honestly contracted for their benefit, or that they desire the stain of repudiation to rest upon their growing and lovely city, to mar its fair fame and its conspicuous beauty.

Further, as to the defense of limitation. The act of limitation is founded on the ground that the proofs of a defense to a claim may cease to exist or be destroyed by lapse or operation of time. This cannot be so in this case. The claim here asserted is bonds signed, sealed, and delivered, having the attestation of such indicia of genuineness and bona fides. They were issued after the original indebtedness was examined into, and found to be justly and honestly due. It would be strange if a register or record was not kept of them by the city authorities. No doubt there was, for their genuineness and honesty are not impugned in this case by any one. These evidences constitute a permanent record, and they may be fairly inferred to exist, and to be in the hand of the city government. No testimony as to the bonds of the petitioning creditor has been lost. They remain in the form of a permanent record, as a check on anyone who may dare to present spurious bonds for funding, and to expose such an attempt. The bonds of the petitioner are presented to the trustees for their inspection, and it is not pretended in any way that they were or could be at all deceived or entrapped. Why, under these circumstances, any delay or laches or staleness should be held to operate against the petitioner here, I cannot see. The whole matter is well attested, and the circumstances existing explained. The city was much embarrassed, and was slow in making payments, even of the interest on the bonds. The creditor indulgently waited, and now it is urged he should be mulcted for it by losing his debt. Can this be just or equitable, under any view that can be taken of the case? I can see no particle—no scintilla—of equity in any such contention.

Another matter may be adverted to in this connection. It is clear that the legislation in relation to the funding of these bonds was accepted by the authorities of the city of Sacramento, if these acts were not passed by their procurement. It is found in Freehill v. Chamberlain, reported in 65 Cal. 603, 4 Pac. 646 (see eleventh finding in this case), that these acts were procured to be passed by them. Can we not look to the record in the case cited, under section 1875, Code of Civil Procedure, subdivision 8? These facts are of general interest, as a part of the history of the city of Sacramento. Courts should be able to look to them. It is said

by Heydenfeldt, J., speaking for a concurring court in Irwin v. Phillips, 5 Cal. 146, that "courts are bound to take notice of the political and social condition of the country which they judicially rule." In Conger v. Weaver, 6 Cal. 556, 65 Am. Dec. 528, the same learned judge, speaking for the court, said: "Every judge is bound to know the history and leading traits which enter into the history of the country where he presides." Should not these facts be noted as a part of the history of the country? Certain it is, the acts were accepted by the government of Sacramento after they were enacted, and they have reaped the benefit from them that they were designed to secure. After carrying out these acts, and acting under them, they should not now be permitted to turn round, and urge lapse of time as a reason why they should not acknowledge and fund the bonds of an indulgent creditor.

For the foregoing reasons I am of opinion that the lapse of time in asking for the funding of the bonds herein involved furnishes no reason or excuse why the prayer of the petitioner herein should not be granted; that to refuse such a prayer would be highly unjust, and sanctioning repudiation of an honest debt; and that the judgment should be reversed, and the cause remanded, with directions to the court below to enter a judgment for petitioner as asked for by him.