#### OF THE

## STATE OF ARIZONA

### FROM MARCH 7, 1916, TO APRIL 18, 1917.

[Civil No. 1455. Filed March 7, 1916.]

[155 Pac. 736.]

FRANK J. BLOUNT, F. W. GRIFFIN, V. C. COOK and EMIL GANZ, Appellants, v. GEORGE A. MacDONALD, as Treasurer and Ex-officio Tax Collector of Maricopa County, Arizona, and LIN B. ORME, WILLIAM A. MOEUR and FRANK LUKE, Constituting the Board of Supervisors of Maricopa County, Arizona, Appellees.

1. MUNICIPAL CORPORATIONS—LEGISLATIVE CONTROL.—The powers of all municipal corporations exist only by authority of the state, and, subject to constitutional limitations, the legislature may erect, change, divide and abolish such corporations at pleasure.

2. MUNICIPAL CORPORATIONS — ANNEXATION OF PART OF ANOTHER MUNICIPALITY—EFFECT.—Where an incorporated city, acting under Civil Code of 1901, paragraphs 509–517, authorizing such cities to extend, enlarge, and increase their corporate limits, annexed part of a road district, the city corporation acquired the right to exercise over the property and inhabitants of the annexed part of the district the political and governmental powers delegated to it by law.

3. MUNICIPAL CORPORATIONS—BONDS—RIGHT TO ISSUE.—The right of such a municipality to issue bonds is not political or governmental, but a private, corporate power conferred for local purposes, in the exercise of which function the municipality acts as a private corporation whose obligations are secured by all constitutional guaranties.

4. MUNICIPAL CORPORATIONS—ANNEXATION TO ANOTHER MUNICIPALITY—RIGHTS AND LIABILITIES OF ANNEXING CITY.—A city, by the an-

XVIII Ariz.—1                    (1)

nexation of a road district under authority of statute, acquired no
rights and assumed no liabilities of the district not of a political
or governmental nature.

5. MUNICIPAL CORPORATIONS—ANNEXATION—POWER TO TAX.—In the
absence of express statutory provision, a city which annexed part
of a road district did not acquire power to tax the annexed prop-
erty to redeem bonds of the district and pay the interest thereon.

6. MUNICIPAL CORPORATIONS — ROAD IMPROVEMENT BONDS — ANNEXA-
TION—STATUTE—"IN."—Under Laws of 1907, chapter 66, section
9, providing that the county supervisors shall issue road improve-
ment bonds in the number and amount provided in proceedings for
their issuance by a road district, which bonds shall be payable out
of the road fund of such district, the money to be raised by taxa-
tion by the county supervisors "upon all of the taxable property in
such district for the redemption of the bonds and the payment of
the interest thereon," where bonds of a road district were issued
after part of the district, as originally formed, had been annexed
by the city of Phoenix, under Civil Code of 1901, paragraphs 509–
517, but before another part of the district was so annexed prop-
erty situated in the territory first annexed was not liable to taxa-
tion by the county supervisors to pay the bonds or interest, but
property in the territory of the district annexed after issuance of
the bonds was so liable, since "in," used in the statute, has refer-
ence to space or place, and not to the corporate entity of the road
district, while to construe the act otherwise than as requiring the
county supervisors to levy upon property in the district at the time
of the bond issue would be to render it unconstitutional, as impairing
the obligation of the district's contract.

[As to implied power of municipality to borrow money or incur
indebtedness for public improvements, see note in Ann. Cas. 1913D,
77.]

APPEAL from a judgment of the Superior Court of the
County of Maricopa. R. C. Stanford, Judge. Reversed and
remanded.

Messrs. Kibbey, Bennett & Bennett, for Appellants.

Mr. F. H. Lyman, County Attorney, for Appellees.

CUNNINGHAM, J.—During the year 1907, the exact date
not appearing in the record, under the authority of chapter
66 of the Legislative Assembly Laws of 1907, a special road
district was formed and designated as special road district
No. 1 of Maricopa county, Arizona. The area described as

embraced within the original boundaries of the road district extended from the northern corporate limits of the city of Phoenix, thence to the Arizona Canal, a distance in a northerly direction of approximately seven miles. The territory described included the northwest quarter of the northeast quarter and the northeast quarter of the northwest quarter of section 5, township 1 north, of range 3 east of the Gila and Salt River base and meridian, adjoining the corporate limits of Phoenix along its northerly line. On January 12, 1909, the northwest quarter of the northeast quarter of said section 5, and on the twenty-seventh day of March, 1913, the northeast quarter of the northwest quarter of said section 5 were, on said respective dates, duly and regularly annexed to and became a part of the city of Phoenix pursuant to the provisions of chapter 4, title 11, of the Revised Statutes of Arizona of 1901, as amended.

On the twenty-first day of June, 1909, the board of supervisors of Maricopa county, having been duly and regularly authorized, issued and sold the said road district improvement bonds in the sum of $30,000, pursuant to section 9 of chapter 66 of the Laws of 1907; and on February 15, 1913, pursuant to the terms of the same statute, said board of supervisors issued and sold additional bonds of the said road district in the further sum of $30,000. The plaintiffs allege in respect to each of said bonds issued as follows:

"That said bonds were so duly issued and sold, and the same, with the interest accrued and to accrue thereon, are now the outstanding and valid obligations of said special road district No. 1 of Maricopa county, Ariz."

Hence no question of the validity of the bonds is raised upon this record.

The plaintiffs allege that the board of supervisors of Maricopa county for the year 1914 caused to be assessed and levied upon the real estate of the plaintiffs located in and being a part of the northwest quarter of the northeast quarter of said section 5 a tax of eleven cents on each $100 valuation, in addition to all other taxes levied for that year upon said property, for the purpose of the payment of the interest due and to become due upon the bonds of said road district, dated June 21, 1909. And for the same year the said board of supervisors caused to be assessed and levied upon the lands

of plaintiffs located in and being a part of the northeast quarter of the northwest quarter of said section 5 a tax of twenty-four cents on each $100 of the assessed valuation thereof, in addition to all other taxes levied and assessed against the same for the year 1914, for the alleged purpose of providing for the payment of the interest due and to become due upon the two issues of the bonds of said special road district; that is, the issue of bonds dated June 21, 1909, and the issue of bonds dated February 15, 1913.

Plaintiffs show a willingness to pay all taxes on their said property other than the taxes above mentioned, and allege that the tax collector has refused to accept payment less than the amounts inclusive of the said road district bond taxes. They allege a purpose of the officers to continue to levy and collect taxes upon said property for said purpose unless restrained, that they sue in behalf of themselves and many others similarly situated, and pray relief from the said road district taxes levied against their property which was formerly within the said road district, but subsequently added to the city of Phoenix, for a restraining order, and general relief.

The defendants demur upon the grounds: (1) that the complaint fails to state facts sufficient to constitute a cause of action; (2) that the facts stated are insufficient to authorize injunctive relief, or any equitable relief; (3) that from the complaint it appears that plaintiffs have legal remedies; and (4) that several causes of action are improperly united.

The court sustained the demurrer to the complaint upon the grounds that the complaint fails to state facts sufficient to constitute any cause of action against defendants or either of them; and fails to state any grounds for the relief prayed. The plaintiffs elected to stand upon their complaint, and judgment followed dismissing the action on the merits. From which judgment the plaintiffs prosecute this appeal.

The appellants have assigned as error the order of the court sustaining defendants' demurrer to plaintiffs' complaint, and the order dismissing the complaint and dissolving the temporary injunction issued therein. Fairly stated, the plaintiffs contend that the special road district, when organized, became a municipal corporation, having conferred upon it the exclusive charge of and control over all the roads and highways within the district.

"The district levies its own taxes, may cause its bonds to be issued, and sold, and the proceeds are under the control and subject to the order of the trustees. . . . The dominion of the special road district over the roads and highways within the district is a complete and exclusive dominion, and is inconsistent with the exercise of any power or dominion of such roads and highways by any other political subdivision of the state. By the act incorporating the city of Phoenix, the city is given exclusive control over the streets, alleys, avenues, and sidewalks of the city."

From a consideration of the existence of this conflict of dominion over the streets and public highways by the road district and city within the territory involved, appellants argue that upon annexation becoming complete the city acquired the exclusive dominion over the annexed territory for all purposes, and the road district lost its dominion over the territory for all purposes, including the right to tax the property for the purpose of raising a fund for the payment of the bonds and interest thereon.

Certainly the powers of both corporations exist only by authority of the state.

"Subject to constitutional limitations, the power of the legislature' over such corporations is supreme and transcendent; it may, where there is no constitutional inhibition, erect, change, divide, and even abolish them at pleasure as it deems the public good to require." 1 Dillon on Municipal Corporations, 5th ed., sec. 92.

"Municipal corporations are the creatures—mere political subdivisions—of the state, for the purpose of exercising a part of its powers. They may exert only such powers as are expressly granted to them, or such as may be necessarily implied from those granted. What they lawfully do of a public character is done under the sanction of the state. They are, in every essential sense, only auxiliaries of the state for the purposes of local government. They may be created, or, having been created, their powers may be restricted or enlarged, or altogether withdrawn, at the will of the legislature; the authority of the legislature, when restricting or withdrawing such powers, being subject only to the fundamental condition that the collective and individual rights of the people of the municipality shall not thereby be destroyed." HARLAN, J.,

in *Atkin* v. *Kansas,* 191 U. S. 207, 220, 48 L. Ed. 148, 157, 24 Sup. Ct. Rep. 124, 127.

Further defining municipal corporations, the same eminent judge in the same opinion says:

"That court [referring to the supreme court of Kansas], in the present case, approved what was said in *Clinton* v. *Cedar Rapids & M. River Co.,* 24 Iowa, 455, 475, in which the supreme court of Iowa said: 'Municipal corporations owe their origin to, and derive their powers and rights wholly from, the legislature. It breathes into them the breath of life, without which they cannot exist. As it creates, so it may destroy. If it may destroy, it may abridge and control. Unless there is some constitutional limitation on the right, the legislature might, by a single act, if we can suppose it capable of so great a folly and so great a wrong, sweep from existence all of the municipal corporations in the state, and the corporation could not prevent it. We know of no limitation on this right so far as the corporations themselves are concerned. They are, so to phrase it, the mere tenants at will of the legislature.' "

Hence the matter of conflict is immaterial, and the question whether the right or power has been granted is alone controlling.

The legislature acted within the powers above referred to while enacting the general statute (chapter 66, Laws of 1907) providing for the formation of special road districts, and empowering the taxpayers of such district to authorize the issuance and sale of the bonds for the purpose of making district road improvements within such district, and providing a means of payment of such bonds. The legislature acted within such powers while enacting chapter 11 of title 6 of the Revised Statutes of Arizona of 1901, whereby incorporated cities are authorized to extend, enlarge and increase their respective corporate limits.

The special road district, when organized under said chapter 66, became a public agency, having conferred upon it the political and governmental powers of management and control over the roads and highways within such district. Special road district No. 1, from the date of its organization, was first granted such political and governmental powers over the entire district as originally described. These powers were with-

drawn over the northwest quarter of the northeast quarter
of said section 5 by the act of the city corporation extending
its corporate authority over such territory as it was permitted
to do by said chapter 11 of the Revised Statutes of Arizona
of 1901.    Thereupon the city gained and the road district
lost all of the political and governmental rights and powers
theretofore granted and exercised by the special road district
over the said property and inhabitants affected.    Such change
of dominion was a legislative change, or brought about by
legislative authority, because all of the acts performed in com-
pleting the said change of dominion were acts authorized by
legislative sanction.    At the time said property was detached
from the said road district and annexed to the city corpora-
tion, to wit, January 12, 1909, no improvement bonds of the
road district had been authorized, issued or sold.

On March 27, 1913, pursuant to the said chapter 11, *supra,*
the city of Phoenix further extended and enlarged its corpo-
rate bounds, by annexing the northeast quarter of the north-
west quarter of said section 5, and thereby further reduced
the area of said road district.    By said proceedings the city
corporation acquired the exclusive political and governmental
dominion of such territory coextensive with such powers and
rights granted to it by law over any and all parts of its cor-
porate territory.    Prior to said twenty-seventh day of March,
1913, bonds of the said road district in the aggregate sum of
$60,000 had been authorized, issued and sold, pursuant to
the authority granted by said chapter 66 of the Laws of 1907.

It is manifest that after the property in question ceased
to be a part of the road district and became a part of the
city, no conflict of dominion of such property could exist be-
tween the road district as a public agency and the city cor-
poration as a public agency, by reason of the issuance and
sale of the road district bonds accomplished prior to the said
change of dominion.    By such change of dominion the city
corporation acquired the right to exercise over such property
and the inhabitants all the political and governmental powers
delegated to it by law to be exercised over any and all parts
of its political domain.    The right to issue bonds of a desig-
nated district and territory, including the state, county,
cities, towns or other communities, is neither a political nor
governmental power, but a private, corporate power con-

ferred for local purposes. As said by Mr. Justice FIELD in speaking for the court in *Broughton* v. *Pensacola*, 93 U. S. 266, 23 L. Ed. 896:

"Although a municipal corporation, so far as it is invested with subordinate legislative powers for local purposes, is a mere instrumentality of the state for the convenient administration of government, yet, when authorized to take stock in a railroad company, and issue its obligations in payment of the stock, it is to that extent to be deemed a private corporation, and its obligations are secured by all the guaranties which protect the engagements of private individuals. The inhibition of the Constitution which preserves against the interference of a state the sacredness of contracts applies to the liabilities of municipal corporations created by its permission; and, although the repeal or modification of the charter of a corporation of that kind is not within the inhibition, yet it will not be admitted, where its legislation is susceptible of another construction, that the state has in this way sanctioned an evasion of or escape from liabilities the creation of which it authorized."

If this rule is applicable, and I think it is, the city of Phoenix, by the change in its charter, acquired no rights or assumed no liabilities of the road district entity not of a political or governmental nature; and the matter of causing to be issued and sold the bonds of the said road district must be deemed the business transaction of the road district exercised within a power granted and of a private business nature, and in no sense a political or governmental power of a nature granted by general laws to city corporations. Hence the city of Phoenix, by extending its corporate limits over the road district, would in no sense acquire any power or be deprived of any rights over the territory covered other than such rights as are purely political and governmental or expressly granted to it. Certainly the city acquired, by the annexation proceedings, no power to tax the property annexed for the purpose of redeeming the road bonds and paying the interest thereon, nor because the property annexed was at the time of annexation a part of the road district liable for the bonds. Otherwise the city would become liable for a portion of the bonded debt of the road district. This cannot occur except by express legislative enactment,

and no such legislation exists. The rule in this respect is as well settled as any rule of law applicable to municipal corporations. Such rule may be stated as follows:

"Where the legislature does not prescribe any different regulations, the rule is that the old corporation owns all the public property within its new limits, and is responsible for all debts contracted by it before the act of separation was passed, which debts it must pay, without any claim for contribution from the new subdivision." *Laramie County Commrs.* v. *Albany Co. Commrs.,* 92 U. S. 307, 23 L. Ed. 552.

The citation of other cases is deemed unnecessary, they are so numerous.

The question raised in this case is not solved by looking for conflict of dominion over the property. We must inquire into the purposes of the levy, and how that right of taxation arose, if such right exists in law. The purpose of the tax is to raise a fund with which to redeem the bonds and pay the interest on the bonds. The bonded indebtedness arose in the following manner: The trustees of the road district deemed it necessary to raise a large sum of money to use in making improvements upon the highways within their road district, and thereupon issued a call for an election of the taxpayers of the district and submitted to said taxpayers the question whether the bonds of said district should be issued and sold for the purpose of raising money for the purpose of making the district road improvements within such district, giving notice of the amount and denomination of the bonds, the rate of interest, the number of years the whole or any part of such bonds were to run. Upon the return of such election the trustees met and canvassed such returns, and it appeared that two-thirds of the vote cast at such election were in favor of the issuance of such bonds. Thereupon the trustees caused an entry of that fact to be made upon their minutes, and certified to the board of supervisors of the county all of the proceedings had in the premises. Thereupon said board of supervisors were authorized and directed to issue the bonds of such district in the number and amount provided in such proceedings. See Laws 1907, c. 66, sec. 9. The board of supervisors are required to issue such bonds in the number and amount provided in such proceedings, "payable out of the road fund of such district, naming the same [that is,

naming the road district], and that the money shall be raised by taxation upon all of the taxable property in such district for the redemption of the bonds and the payment of the interest thereon.'' Section 9, c. 66, *supra,* pp. 93, 94.

The money for the redemption of the bonds and the payment of the interest thereon must be raised as follows:

''The board of supervisors, at the time of making the levy of taxes for county purposes, must levy a tax for that year upon the taxable property in such district for the interest and redemption of said bonds, and such tax must not be less than sufficient to pay the interest on said bonds for that year, and such portion of the principal as is to become due during such year, and . . . all moneys so levied, when collected, shall be paid into the county treasury to the credit of the bond fund of such district, and be used for the payment of principal and interest on said bonds and for no other purpose.'' Section 9, c. 66, *supra,* p. 94.

The statute places no duty upon the road district to be performed by it in its corporate capacity in connection with the bonds except to certify the proceedings authorizing their issuance and sale, and to issue warrants against the fund raised by the sale of the bonds, and to issue its warrants against the fund raised from taxation in payment of the bonds and interest thereon. The matter of providing the redemption and interest fund is cast upon the board of supervisors by their act of issuing and selling the bonds, and commences to exist at that time. This fund must be raised by a levy of a tax for each year upon the taxable property ''in such district.''

The contention of the appellants is that their property is not subject to such levy. It is clear that, unless the property in question is, in fact, ''taxable property in such district'' within the terms of the statute, the levy is invalid. So that the gist of appellants' contention is that their property is not subject to the tax levy within the meaning of the words ''in such district,'' as used in this statute. It is not contended that the property within the northeast quarter of the northwest quarter of said section 5 ceased to be a part of the road district at a time prior to the date of the issuance and sale of the bonds, but, on the other hand, the fact is conceded that such property remained a part of the road district until after

both series of bonds were issued and sold. Therefore, if the contention of appellants prevails, the words of the statute, viz., ''in such district,'' must be interpreted to have reference to the territorial extent of the district as it exists at the time the tax is levied by the board of supervisors, and to have no reference to the territorial extent of the road district at the time the bonds are issued and sold, provided the limits of the road district be, in fact, changed after the date of issuance and sale of the bonds and before a given levy of the taxes is made. The action is an attack upon the authority of the taxing officers to levy the tax upon specific property, and is, in effect, a denial of the existence of any law authorizing such a levy upon the property in question. The inquiry then, confined to its narrowest limits, is whether any valid law exists which authorizes the appellees to levy the tax in question upon appellants' described property for the purpose of raising the money for the payment of the interest, and to create a sinking fund for the redemption of the said bonds. A correct answer to this question must be found in the statutory law of the state which authorizes the tax.

The appellees contend in effect that they, in making this levy, performed their plain statutory duty, as prescribed by section 9 of chapter 66 of the Laws of 1907, page 94, whereby the board of supervisors, ''at the time of making the levy of taxes for county purposes, must levy a tax for that year upon the taxable property in such district for the interest and redemption of said bonds; . . . and all moneys so levied, when collected, shall be paid into the county treasury to the credit of the bond fund of such district, and be used for the payment of principal and interest on said bonds and for no other purpose. . . . ''

The expression ''in such district'' clearly refers to the road district which authorized the issuance and sale of the bonds, being the road district mentioned in an earlier part of the statute. The statute emphatically makes the bonds authorized to be issued, ''payable out of the road fund of such district, naming the same, and that the money shall be raised by taxation upon all of the taxable property in such district for the redemption of the bonds and the payment of the interest thereon.'' This is not a requirement of ''such road district'' to pay the bonds authorized, but ''the money shall

be raised by taxation upon all of the taxable property in such district.'' Clearly all of the taxable property in such district has reference to no other property than was within the space of such road district at the time the bonds became an obligation of the district. Therefore the words ''taxable property in such district'' upon which the board of supervisors are each year required to levy a tax for their redemption and payment of interest have reference territorially to the same property made liable to taxation for the purpose of raising money for their redemption and for paying the interest thereon at the time the bonds became a liability of the road district; that is, the property of the road district which became liable to taxation for the purpose of raising the money for the redemption of the bonds and the payment of the interest thereon remains liable to taxation for such purpose until the bonds and interest have been discharged, and until such liabilities have been discharged the county officers are under the legal duty to levy and collect the tax for that purpose. Such is the clear meaning of the statute authorizing the issuance and sale of the bonds.

We are clear that under the statute authorizing the road district bonds the bonds, when sold, fix a liability for their redemption and the payment of the interest upon all the taxable property subject to the tax then in the district, and such property continues liable to such taxation until the liability of indebtedness is discharged. The matter of change in road district lines after the bond liability is fixed is without effect in relieving property subject to such tax from the tax by reason of falling outside of the road district line by the change. The money to raise the fund from which the road district must pay the bonds, and the interest thereon is required to be raised by the county board of supervisors through said taxation. The bonds remain the obligation of the road district until discharged, and the road district has no other source of discharging the debt except by payment from the road fund or bond fund of the road district in the county treasury. The road trustees have no power to raise such fund. They have no part in the proceedings of raising the fund. That duty is cast exclusively upon the board of supervisors to levy a tax, and that duty begins with the issuance and sale of the bonds.

The road district trustees are not required to certify to the board of supervisors each year the amount of money required to pay the interest on the outstanding bonds, nor to do any act in relation thereto, but the board of supervisors must compute the amount of the levy, and "must levy a tax for that year upon the taxable property in such district for the interest and redemption of said bonds." In order to accomplish such duty the territory to be taxed must be a definite, fixed territory at the time of the levy. It is true that by reference to the public records of their county the board of supervisors are charged with notice that both tracts of land above described in this record ceased to be a part of the said road district for all special road district purposes from the time they were respectively annexed to the city of Phoenix, and thereafter were not a part of the property of said special road district for such special road district purposes at the time the levy was being made; but the "money shall be raised by taxation upon all of the taxable property in such district for the redemption of the bonds and the payment of the interest thereon" is the command and pledge of the statute. That the words "in such district," as they appear in connection with the pledge, have territorial reference to the district as it territorially existed at the time the bonds were authorized by the taxpayers and became a liability, there can exist no serious doubt. That the legislature so intended the reference to be understood there can be no doubt, and, when the legislature in a subsequent part of the statute commands the board of supervisors to carry out the pledge by levying the "tax for that year upon the taxable property in such district," no candid mind could doubt from this use by the legislature of the word "in" in the connection as used intended to have reference to space or place, and not to have reference to the corporate entity of the road district. Such use of the word "in" is one of its ordinary uses recognized by the lexicographers, and the legislature is deemed to be familiar with the meaning and ordinary use of ordinary words of the language. So understood, the command of the statute to the board of supervisors is to levy the tax each year upon all of the taxable property "in" such district for the purpose of raising money for the purpose of redeeming such bonds and paying the interest thereon. The command

is not to levy a tax each year on all of the taxable property
"of" the special road district No. 1. To give to the word
"in" the same use in the command as the word "of" would
do violence to the language. The clear, plain language of
the statute needs no interpretation, but must be held to mean
just what it says. The tax must be levied upon all of the
taxable property in such district each year. This annual tax
was the security offered by the state to the investor as an in-
ducement to extend credit for the purpose of making road
improvements; and, when the bonds were sold, the purchaser
accepted the said offer and security, which security upon
acceptance became a very substantial part of the contract.
When the bonds were sold, the transaction was the closing of
a legislative contract.

To say that by a construction of other parts of the law
the taxable property in such district could, after incurring
the obligation arising from the issuance and sale of bonds, be
subtracted *ad infinitum* until only the merest fraction of such
property is left to bear the burden, and such a fraction of
the property remaining only is liable to meet the principal
and interest of the bonds, is to say that the obligation of a
contract may be impaired and a fraction of the property in
the district confiscated in an effort to meet the obligation in-
curred. If property could be segregated from such district
to the extent of leaving property only of a value less or even
equal to the principal and interest of the bonds, then, of
course, nothing would be left but an obligation which such
property must acquit, and be entirely used up in its acquit-
tance. This ought not to be said. We think the legislation
authorizing the creation of the indebtedness and providing
the special mode for its payment by the levy and collection
of a special tax on all property in the district is of great con-
sequence, not only to the property remaining in the district,
but is so intimately connected with the obligations of the
contract that any subsequent limitation or restriction of the
power either by legislation or judicial construction which
substantially modifies that mode so as injuriously to affect
rights under the contract is void as an impeachment of its
obligation. A fair interpretation of the statute as it existed
when the bonds were authorized, issued and sold admits of
no other conclusion. While the holders of the bonds are not

parties to the action, and would not be concluded by any decision herein, nevertheless any other ruling would not only place an undue burden upon remaining property, but might involve this court in inextricable difficulties should the rights of the bondholders to have the security given them by the law remain unimpaired arise in the future.

"The annual tax was the security offered to the creditors [here the purchasers], and it could not be afterward severed from the contract without violating its stipulations, any more than a mortgage executed as security for a note given for a loan could be subsequently repudiated as forming no part of the transaction," as said by Justice FIELD in *Louisiana* v. *Pilsbury,* 105 U. S. 278, 26 L. Ed. 1090, 1093.

Continuing, the justice says:

"Nearly all legislative contracts are made in a similar way. The law authorizes certain bonds to be issued, or certain work to be done upon specified conditions. When these are accepted, a contract is entered into imposing the duties and creating the liabilities of the most carefully drawn instrument embodying the provisions"—citing cases.

See, also, *Bates* v. *Porter,* 74 Cal. 224, 15 Pac. 732, and *Meyer* v. *Brown,* 65 Cal. 583, 4 Pac. 25, 26 Pac. 281.

There can be no serious question that so much of the ninth section of chapter 66 of the Laws of 1907 as provides for the manner in which the tax to pay the road district bonds is to be levied, and the safeguards for the levy upon the taxable property in such district and the collection of the tax, constitutes a contract with the bondholder, the substantial performance of which he is entitled to exact. *Maenhaut* v. *New Orleans,* 2 Woods, 108, 16 Fed. Cas. No. 8939, citing 1 Dillon on Municipal Corporations, sec. 41; *Woodruff* v. *Trapnall,* 10 How. (51 U. S.) 190, 13 L. Ed. 383; *Curran* v. *Arkansas,* 15 How. (56 U. S.) 304, 14 L. Ed. 705; *United States (Von Hoffman)* v. *City of Quincy,* 4 Wall. (71 U. S.) 535, 18 L. Ed. 403; *Furman* v. *Nichol,* 8 Wall. (75 U. S.) 44, 19 L. Ed. 370; *People* v. *Woods,* 7 Cal. 579; *People* v. *Bond,* 10 Cal. 563; *Brooklyn Park Commrs.* v. *Armstrong,* 45 N. Y. 234, 6 Am. Rep. 70.

In *Kennedy* v. *Sacramento* (C. C.), 19 Fed. 580, the court holds that the city officers were subject to *mandamus* at the suit of bondholders requiring them to carry out the provisions

of the law under which the bonds were issued, providing for a tax levy for the payment of the bonds, notwithstanding a change in the law, for the reason any other construction of the law would impair the obligation of the bond contract.

In *Chambers* v. *Adair,* 110 Ky. 942, 62 S. W. 1128, it is said:

"The petition in this case does not allege that the property of the plaintiff which was sought to be taxed was not included in the boundary of school district No. 1 of Hancock county, as originally laid off under the act of 1873. At that time it is manifest from the act that a very considerable amount of property was included in that district which was exterior to the boundaries of the city of Hawesville, and which were subsequently included in the city by the act of 1882; and a subsequent change of the city boundaries would not affect the liability of the property included in the boundary of district No. 1 as originally projected for the payment of the bonds after their sale for the purpose of raising money for the erection of school buildings."

In *United States (Von Hoffman)* v. *Quincy,* 4 Wall. (71 U. S.) 535, 18 L. Ed. 403, the court discusses the question of impairing the obligation of contracts by the state, and, after reviewing the authorities on the question, applies the rule to the case before the court as follows:

"When the bonds in question were issued, there were laws in force which authorized and required the collection of taxes sufficient in amount to meet the interest, as it accrued from time to time, upon the entire debt. But for the act of the 14th of February, 1863, there would be no difficulty in enforcing them. The amount permitted to be collected by that act will be insufficient; and it is not certain that anything will be yielded applicable to that object. To the extent of the deficiency the obligation of the contract will be impaired, and, if there be nothing applicable, it may be regarded as annulled. A right without a remedy is as if it were not. For every beneficial purpose it may be said not to exist.

"It is well settled that a state may disable itself by contract from exercising its taxing power in particular cases. *New Jersey* v. *Wilson,* 7 Cranch [U. S.], 166 [3 L. Ed. 303]; *Dodge* v. *Woolsey,* 18 How. [U. S.] 331 [15 L. Ed. 401];

*Piqua Branch Bank* v. *Knoop,* 16 How. [U. S.] 369, [14 L. Ed. 977]. It is equally clear that, where a state has authorized a municipal corporation to contract and to exercise the power of local taxation to the extent necessary to meet its engagements, the power thus given cannot be withdrawn until the contract is satisfied. The state and the corporation in such cases are equally bound. The power given becomes a trust which the donor cannot annul, and which the donee is bound to execute; and neither the state nor the corporation can any more impair the obligation of the contract in this way than in any other. *People* v. *Bond,* 10 Cal. 563, 570; *Dominick* v. *Sayre,* 3 Sandf. 555.

''The laws requiring taxes to the requisite amount to be collected, in force when the bonds were issued, are still in force for all the purposes of this case. The act of 1863, is, so far as it affects these bonds, a nullity. It is the duty of the city to impose and collect the taxes in all respects as if that act had not been passed. A different result would leave nothing of the contract, but an abstract right—of no practical value—and render the protection of the Constitution a shadow and a delusion.''

In the case at bar, when the bonds were issued, the law in force required the board of supervisors to levy a tax upon the taxable property in the district issuing the bonds. If the state authorized any action to be thereafter taken by the city of Phoenix by means of which subsequent act—such as by the extension of its corporate limits over a part of the property so pledged for taxation—it could withdraw from taxation for said purpose a part of such property, then clearly the act of the city withdrawing the property from the road district would violate the constitutional inhibition, because the effect would be to impair in a measure the obligation of the bond contract, under all the authorities.

On the other hand, if we construe chapter 66 as meaning that all taxable property in such district has reference to the territorial extent of the district at the time the bonds were issued, and not to the special road district No. 1 corporation, the act of the city extending its corporate limits remains without constitutional conflict, and is effective from the date of its completion to confer upon the city corporation all municipal rights and powers over the annexed territory which it pre-

XVIII Ariz.—2

viously had over its original territory. The board of supervisors retained the authority under chapter 66 and the vote of the taxpayers and certificate of the road district trustees to levy the tax on all the taxable property in such district as such district existed in territorial extent at the time the bonds were issued. By such interpretation of the statutes, and the actions taken thereunder, all the laws in force and the acts of all parties concerned are valid and without conflict at any point.

Applying the foregoing principles to the facts in this case as they appear from the complaint, the northwest quarter of the northeast quarter of section 5 was detached from the road district, and became annexed to the city on January 12, 1909, and comprised no part of the taxable property in such road district on June 21, 1909, when the first series of road bonds were issued and sold. Hence said property constituted no part of the taxable property "in such district," and was not subject to the levy complained of. Consequently, as concerns the portion of such property and its owner, appellant V. C. Cook, and parties in like situation, the complaint states a cause of action, and states facts justifying the issuance of a restraining order, enjoining the tax collector from collecting said tax, said levy being without authority of law.

Upon the same principles of law the complaint fails to state a cause of action, as it regards the property described as the northeast quarter of the northwest quarter of section 5, for the reason such property was "in such district" at the time both series of bonds were issued and sold as said fact appears from the complaint, and therefore was taxable for the purpose of raising money for the redemption of the bonds and for the payment of the interest thereon, until such indebtedness is paid.

The judgment appealed from is in its nature an entire judgment based upon an order sustaining a demurrer to the complaint for its failure to state sufficient facts. For this reason, it is not competent for this court to so modify the judgment as to do exact justice. Therefore the judgment must be reversed upon the grounds that the complaint states a good cause of action, as it respects the property of appellant V. C. Cook and parties similarly situated.

The judgment is therefore reversed, and the cause is remanded to the superior court of Maricopa county, with instructions to overrule the demurrer, and take such further proceedings, not inconsistent with this opinion, as the law provides.

Reversed and remanded.

FRANKLIN, J., and PERKINS, Superior Court Judge, concur.

N. B.—Chief Justice ROSS being disqualified, and announcing his disqualification in open court, the remaining judges, under section 3 of article 6 of the Constitution, called in Honorable F. W. PERKINS, Judge of the superior court of the state of Arizona in and for the county of Coconino, to sit with them in the hearing of this cause.